Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 9, 2004     Decided February 24, 2004

No. 02-1060

IN RE: JAMES M. TENNANT,
PETITIONER

————

On Petition for Writ of Mandamus

————

*Cary Berkeley Kaye*, Supervising Attorney, argued the cause as amicus curiae in favor of petitioner's position. With her on the briefs was *Steven H. Goldblatt*, Director of the Appellate Litigation Program, Georgetown University Law Center, appointed by the court.

*James M. Tennant*, *pro se*, Georgetown, S.C., was on the briefs for petitioner.

*John E. Ingle*, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for respondent. With him on the brief were *Andrew C. Mergen* and *Susan L. Pacholski*, Attorneys, U.S. Department of Justice, *John A. Rogovin*, General Counsel, Federal Communications Commission, and *Lisa E. Boehley*, Counsel.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Stanley M. Gorinson* argued the cause for respondents Cingular Wireless LLC and Crown Castle International Corp. With him on the brief were *Stephen E. Baskin*, *Judith L. Harris*, and *Robert H. Jackson*.

*James Emory Smith, Jr.*, Assistant Deputy Attorney General, Attorney General's Office of State of South Carolina, was on the brief for respondent Rodger Stroup, State Historic Preservation Officer.

Before: SENTELLE, TATEL, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: James M. Tennant petitions this court for a writ of mandamus, as well as declaratory and injunctive relief, relating to an alleged breakdown of historic-preservation procedures in the placement of a wireless communications tower on land listed in the National Register of Historic Places. We find that we lack jurisdiction to grant the requested relief, and so dismiss the petition.

## I.

The chain of events that led to this litigation began on June 23, 1995, when the Federal Communications Commission granted BellSouth Corporation a license to provide cellular telephone service in a geographic area that includes Georgetown, South Carolina. *See In re Applications for A and B Block Broadband Licenses*, 11 F.C.C.R. 3229 (1995). To make use of its license, BellSouth built a network of communications towers in the area. One of the towers was built in 1996 inside the boundaries of Hobcaw Barony, a tract of land in Georgetown that had been included on the National Register of Historic Places since 1994.

Under Section 106 of the National Historic Preservation Act, codified at 16 U.S.C. § 470f, federal agencies are obliged to evaluate the effects of their activities on historic sites:

> The head of any … Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal

funds on the undertaking or prior to the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.

Regulations in place when the tower was built permitted a federal agency to "use the services of grantees, applicants, consultants, or designees" to carry out the agency's duties under Section 106, but the agency remained ultimately responsible for compliance with the statute. 36 C.F.R. § 800.1(c)(1)(i) (1995). During the Section 106 process, an agency (or its designee) consults with a State Historic Preservation Officer (SHPO) to determine whether a proposed undertaking will affect a registered site. *See id.* § 800.1(c)(1)(ii).[1]

Alongside these regulations implementing the NHPA was a set of FCC regulations promulgated under the National Environmental Policy Act. Under the NEPA regulations, licensees planning to build facilities for which no separate pre-construction authorization was required from the FCC were charged with "initially ascertain[ing] whether the proposed facility may have a significant environmental impact." 47 C.F.R. § 1.1312(a) (1995). A significant environmental impact was defined to include an effect on a site listed in the National Register. *Id.* § 1.1307(a)(4). If such an effect was possible, the license applicant was required to prepare an environmental assessment and file it with the FCC for a determination of whether the proposed facility would in fact have that effect. *Id.* §§ 1.1308(a)–(b), 1.1312(b). If the FCC

---

[1] Respondents Cingular Wireless LLC and Crown Castle International Corporation argue that the construction of the tower was not an "undertaking" under the NHPA because the tower was neither federally licensed (the FCC does not issue site-specific construction permits) nor federally funded. Final Opp. of Cingular and Crown Castle at 14–17 (citing *National Mining Ass'n v. Fowler*, 324 F.3d 752, 759–60 (D.C. Cir. 2003)). In light of our disposition of this case on jurisdictional grounds, we do not reach this argument and express no opinion on it.

reached a finding of no significant impact, no further examination of environmental effects was required. *Id.* § 1.1308(d).

BellSouth contacted the SHPO in South Carolina before building the Hobcaw tower, stating that "[n]o known National Register of Historic Places (NRHP)-eligible or -listed sites are located within" the proposed tower site. Letter from R.S. Webb & Assocs. to Nancy Brock, South Carolina State Historic Preservation Office (Sept. 3, 1996). The letter provided a specific description of the location of the proposed tower, stating that the site was "inside the northern boundary fence of the Hobcaw Barony Complex." *Id.* Apparently overlooking this clue that a protected site could be affected, the SHPO replied to BellSouth that the Hobcaw tower "should have no effect on any properties included in or eligible for inclusion in" the National Register. Letter from Brock to Sheila Burns, R.S. Webb & Assocs. (Sept. 10, 1996). It appears that no environmental assessment was prepared — under the applicable NEPA regulations, the requirement for one would only have been triggered by a possible effect on a registered site[2] — and the FCC thus had no occasion to consider the issue of significant impact through its NEPA process. As for the NHPA Section 106 process, it seems that the FCC itself did not make a formal evaluation of the effects of the Hobcaw tower, apparently relying on the applicant: BellSouth's license was issued before the tower sites were chosen, and there is no evidence that the FCC was involved in evaluating environmental considerations after BellSouth selected the Hobcaw site.

Tennant, a resident of Georgetown, noticed the 185–foot tower and raised his concerns about it with BellSouth shortly after it was built. *See* Pet. ¶ 24. He then wrote to the federal Advisory Council on Historic Preservation to call its attention to "a failure of the Section 106 process" involving

---

[2] The regulations expressly invite licensees such as BellSouth to rely on the determinations of SHPOs in establishing whether an environmental assessment is required for a proposed facility. *See* 47 C.F.R. § 1.1307(a)(4) note (1995).

the construction of the tower inside Hobcaw Barony. Letter from Tennant to Don L. Klima, ACHP (Dec. 1, 1998), at 1 (December 1998 Letter). Tennant's letter ended by asking the ACHP and other individuals who were copied on the letter — including the then-Chairman of the FCC — to "collectively ensure that the required Section 106 review process is triggered when required by law." *Id.* at 3.

In a second letter to the ACHP in February 1999, Tennant formally asked the Council to examine any FCC findings under Section 106 in relation to the Hobcaw tower. Letter from Tennant to Martha Catlin, ACHP (Feb. 11, 1999). The Council promptly contacted the FCC and asked for information on how the Section 106 process was conducted when the Hobcaw tower was proposed. Letter from Klima to Cathy Seidel, FCC (Feb. 19, 1999). Hearing nothing from the FCC, the ACHP renewed its request for information in July 1999, and the FCC finally responded in January 2000. Pointing to its NEPA rules, the Commission said that it "delegate[s] to . . . license applicants the responsibility of gathering the information necessary to determine potential environmental effects of proposed . . . towers." Letter from Rose Crellin, FCC, to Klima (Jan. 3, 2000), at 1. BellSouth did not file an environmental assessment, the FCC explained, because "neither the SHPO nor [the] licensee identified any significant effects on historic properties." *Id.* The FCC had "relied upon these determinations." *Id.* In a reply to the FCC, the ACHP asked for the environmental impact documentation that BellSouth had assembled. Letter from Klima to Seidel (Feb. 4, 2000).

Two years later, the ACHP still had not completed its inquiry into the FCC's compliance with Section 106 in the matter of BellSouth's Hobcaw tower, and Tennant had learned that the South Carolina SHPO — apparently relying on its earlier determination regarding the BellSouth tower — had approved the construction of a second tower to be built alongside the existing one, also inside Hobcaw Barony. *See* Letter from Brock to Sarah Fick, Historic Preservation Consultants (Jan. 29, 2001) ("It does not appear . . . that Hobcaw Barony or any properties listed on or determined eligible for

inclusion in the National Register of Historic Places will be adversely affected [by the second tower].").

Tennant turned to this court for relief, filing a *pro se* petition for a writ of mandamus and declaratory and injunctive relief on February 12, 2002. He named several parties as respondents: the FCC, the ACHP, Cingular Wireless (which had acquired the tower from BellSouth), Dr. Rodger Stroup (the South Carolina SHPO), and Crown Castle (a Cingular contractor that manages the tower). He requested a writ of mandamus to require the FCC and the ACHP to follow the required Section 106 procedures, a declaration that the Hobcaw tower adversely affects Hobcaw Barony, a declaration voiding the SHPO's prior determinations, and several injunctions — to prevent Cingular and Crown Castle from collocating additional wireless carriers on the tower, to enjoin the FCC from permitting or licensing additional facilities in the Hobcaw Barony area, and to enjoin the SHPO from "assuming the duties of the FCC in regard to Section 106 compliance." Pet. ¶ 57.

There have been a few further developments since Tennant filed his petition. In August 2003, the Attorney General of South Carolina informed Tennant and the other parties that the SHPO's September 1996 no-effect finding was "incorrect" as to the Hobcaw tower. Letter from J. Emory Smith, Assistant Deputy Att'y Gen., to Stanley M. Gorinson, Kilpatrick Stockton LLP, et al. (Aug. 28, 2003), at 2. And on September 3, 2003, the FCC decided to initiate a Section 106 review for both the existing tower and the proposed second tower. Letter from Jeffrey Steinberg, FCC, to James Bugel, Cingular Interactive, et al. (Sept. 3, 2003), at 1.

## II.

### A.

"Jurisdiction is, of necessity, the first issue for an Article III court." *Tuck v. Pan Am. Health Org.*, 668 F.2d 547, 549 (D.C. Cir. 1981). "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and

limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 382 (1884)).  Tennant's grievance is directed largely at the FCC, and this court has authority to review certain orders of the Commission.  *See* 47 U.S.C. § 402(a), (b)(6);  28 U.S.C. § 2342(1).  But because Tennant's whole point is that the FCC has *not* taken action he believes it should have, there was no order from which he could have taken an appeal.  Precedent has dealt with such a situation, recognizing that the All Writs Act "empowers a federal court to issue writs of mandamus necessary to protect its *prospective* jurisdiction."  *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) (emphasis added) (*TRAC*).

The All Writs Act provides that the federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).  As this statutory language makes clear, the Act is not itself a grant of jurisdiction. "While the All Writs Act authorizes employment of extraordinary writs, it confines the authority to the issuance of process 'in aid of' the issuing court's jurisdiction. . . .  [T]he Act does not enlarge that jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999).  In *TRAC*, the petitioner sought a writ of mandamus because of a lengthy delay in an FCC inquiry responding to the petitioner's complaint that a telephone provider had overcharged its ratepayers.  This court would have had jurisdiction, under 47 U.S.C. § 402(a) (1982), to review any final order arising from the FCC inquiry, and we held that we therefore had jurisdiction to review the petitioner's claim of unreasonable delay "in order to protect [our] future jurisdiction." *TRAC*, 750 F.2d at 76.  *TRAC* cited and built on a body of Supreme Court precedent recognizing that authority under the All Writs Act "extends to those cases which are within [a court's] appellate jurisdiction although no appeal has been perfected." *FTC v. Dean Foods Co.*, 384 U.S. 597, 603–04 (1966) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943)); *see also McClellan v. Carland*,

217 U.S. 268, 280 (1910) ("[W]here a case is within the appellate jurisdiction of the higher court a writ of mandamus may issue in aid of the appellate jurisdiction which might otherwise be defeated by the unauthorized action of the court below.").

A common element in *TRAC* and the Supreme Court precedent on which it relied was that the party seeking relief in the appellate court under the All Writs Act had implicated the prospective jurisdiction of that court by instituting a proceeding in a lower court or agency subject to the jurisdiction of the appellate court. *TRAC* involved an FCC inquiry responsive to a Petition for Enforcement of Accounting that had been filed by the party seeking mandamus. 750 F.2d at 73. In *Dean Foods*, the FTC had initiated a proceeding to determine whether a proposed merger would violate federal antitrust law, and asked the appellate court — which would have jurisdiction to review the FTC's final action in the matter — to enjoin the merger temporarily. 384 U.S. at 604. The petitioners in *Roche* sought a writ of mandamus from the appeals court after a district judge ruled against them on their pleas, *see* 319 U.S. at 23–24, and the *McClellan* petitioners requested that the writ issue from the appeals court to a district judge who had ordered a stay of the pending lower court proceedings, *see* 217 U.S. at 276.

Tennant, however, did not seek a remedy from the FCC or initiate any proceeding in that agency before resorting to this court. As the FCC points out in its brief, there are several avenues by which Tennant could have filed, and may still be able to file, a petition with the Commission. FCC Br. at 30 n.108 (citing 47 C.F.R. § 1.2 (motion for declaratory ruling); *id.* § 1.41 (informal request for FCC action); *id.* § 1.401 (petition for rulemaking); *id.* § 1.1307(c) (petition alleging that action otherwise categorically excluded from environmental review will have significant environmental effect)). The closest thing in the record to a request for FCC action is Tennant's December 1998 letter to the ACHP, a copy of which was sent to the chairman of the FCC. Tennant and the amicus curiae we appointed to present arguments in his favor argue that copying the FCC on the letter qualifies as an

informal request for FCC action. *See* Pet. Br. at 12, 13; Amicus Reply Br. at 26–27; Pet. Reply Br. at 14–15.

Under FCC regulations, an informal request must "set forth clearly and concisely the facts relied upon, the relief sought, the statutory and/or regulatory provisions (if any) pursuant to which the request is filed, . . . and the interest of the person submitting the request." 47 C.F.R. § 1.41. Tennant's letter to the ACHP was at best ambiguous concerning any request for relief from the FCC: he asked the ACHP official "and the individuals listed below" — including the FCC chairman, the director of the National Park Service, BellSouth's environmental consultant, and a reporter from the *Washington Post* — to "collectively ensure that the required Section 106 review process is triggered when required by law." December 1998 Letter at 3. If this was a request that the FCC reopen the Hobcaw tower matter, it was an extremely oblique one, especially since several of the other recipients of the letter had no power to take such action. The language is more fairly read as a plea for prospective relief, for more faithful adherence to the Section 106 process in the future. The letter's concluding statement that Tennant "hope[d] to see BellSouth remove or mitigate the adverse effect of their existing tower at the Hobcaw Barony historic site," *id.*, did not make clear that he expected the addressee, let alone the FCC or any of the other individuals merely copied on the letter, to compel BellSouth to take any action. And although the letter discussed Section 106 of the NHPA, it did not specify "the statutory and/or regulatory provisions" — such as 47 C.F.R. § 1.41 — on which a request for FCC review might have been based. The letter thus stacks up poorly against the regulatory requirements for even an informal request; it also stands in stark contrast with Tennant's February 1999 letter to the ACHP, which quoted extensively from the regulatory provision that governs requests for Council action. Tellingly, even the ACHP did not initiate an inquiry into the FCC's Section 106 compliance until Tennant sent this second letter. It would be unreasonable to hold that the FCC, by virtue of being one of several recipients copied on the first letter, was required to act when even

the direct addressee of that letter did not do so until it received a more specific request.[3]

Because Tennant never initiated a proceeding with the FCC, we do not have authority under the All Writs Act to issue a writ of mandamus "in aid of" prospective jurisdiction to review action the Commission might take. It is one thing to say that we have such authority when, in the formulation used by the Supreme Court, a case is " 'within [our] appellate jurisdiction although no appeal has been perfected.' " *Dean Foods*, 384 U.S. at 603–04 (quoting *Roche*, 319 U.S. at 25); *see also McClellan*, 217 U.S. at 280 (case "within the appellate jurisdiction of the higher court"). It is quite another to claim such power solely on the basis that events *might* lead to a filing before an agency or lower court, which *might* lead to an appeal to this court. Once there has been a proceeding of *some* kind instituted before an agency or court that might lead to an appeal, it makes sense to speak of the matter as being "within [our] appellate jurisdiction" — however prospective or potential that jurisdiction might be. To dispense with even that preliminary requirement would effectively grant us jurisdiction to consider extraordinary writs in any case, because it is easy enough to spin out "for want of a nail" scenarios from any set of facts that could eventually lead to this court. It is not too much to ask that parties seeking mandamus relief take at least the first preliminary step that might lead to appellate jurisdiction in this court in the future.[4]

---

[3] Nor do we accept Tennant's suggestion — not shared by amicus — that a 1996 meeting with BellSouth officials and a 1997 telephone complaint to another BellSouth official, *see* Pet. Br. at 12, 13; Reply Mem. in Support of Mot. for T.R.O. at 1 & n.1, should be regarded as tantamount to filing an informal complaint with the FCC.

[4] Indeed, Tennant and amicus do not dispute the point; they instead rest on their argument that copying the FCC, along with other entities, on an ambiguous letter to the ACHP was adequate to institute a proceeding before the FCC. As we have concluded, it was not.

Tennant — but not amicus — also cites 28 U.S.C. § 1361, which provides that "[t]he district courts shall have original jurisdiction"

Our reasoning is grounded in venerable precedent. When William Marbury petitioned the Supreme Court for a writ of mandamus to compel Secretary of State James Madison to deliver to Marbury his judicial commission, the Court considered whether the issuance of the writ would be "an exercise of appellate jurisdiction, or . . . necessary to enable [the Court] to exercise appellate jurisdiction." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175 (1803). Marbury's petition was not within the Court's appellate jurisdiction because:

> It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause. . . . [T]o issue such a writ to an officer, for the delivery of a paper, is, in effect, the same as to sustain an original action for that paper, and therefore, seems not to belong to appellate, but to original jurisdiction. Neither is it necessary in such a case as this, to enable the [C]ourt to exercise its appellate jurisdiction.

*Id.* at 175–76. Chief Justice Marshall recognized that mandamus would lie in support of the Court's appellate jurisdiction — as was later spelled out in the All Writs Act — but held that such a ground of authority, like any exercise of appellate jurisdiction, was limited to review of "proceedings in a cause already instituted." The mandamus would otherwise be an original action, not in aid of appellate jurisdiction, as of course the Court ultimately concluded. Because Marbury began his efforts to secure his commission in the Supreme Court, mandamus could not be based on the Court's appellate

over petitions for mandamus to compel federal officers or employees to perform their duties. *See* Pet. ¶ 7. That provision does not confer original jurisdiction on this court; "it is well settled that even where Congress has not expressly stated that statutory jurisdiction is exclusive . . . , a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *TRAC*, 750 F.2d at 77 (footnote and internal quotation marks omitted); *see Whitney Nat'l Bank v. Bank of New Orleans & Trust Co*, 379 U.S. 411, 422 (1965).

jurisdiction. So too here Tennant, with respect to the FCC, began his efforts in this court — there was no "cause already instituted" before the agency — and so the mandamus he seeks cannot be justified as "in aid of" our prospective appellate jurisdiction over the FCC under the All Writs Act.[5]

When, as in the *TRAC* line of cases, an agency delays taking action that, if and when taken, would be within our appellate jurisdiction, the All Writs Act confers authority to issue writs of mandamus "in aid of" that prospective jurisdiction. But there is no basis for supposing that such authority is "necessary to protect [our] prospective jurisdiction" from the consequences of agency inaction, or that our "statutory obligation . . . to review on the merits may be defeated by an agency that fails to resolve disputes," *TRAC*, 750 F.2d at 76, when the agency has not yet been asked to do anything.

---

[5] Amicus cites *In re Bluewater Network*, 234 F.3d 1305 (D.C. Cir. 2000), in which this court issued a writ of mandamus ordering the Coast Guard to comply with a statutory mandate to promulgate certain rules. That case is quite different from the present one, in that a statute directed the Coast Guard to issue regulations, challenges to the regulations were to be heard directly in this court — with no need for further agency action to trigger this court's jurisdiction — and the Coast Guard had formally announced in the *Federal Register* that it would not issue the regulations. *See* Oil Pollution Act of 1990, Pub. L. No. 101-380, § 4110, 104 Stat. 484, 515 (codified at 46 U.S.C. § 3703 note) (setting deadline for Coast Guard to issue regulations); 33 U.S.C. § 2717(a) ("Review of any regulation promulgated under this chapter may be had upon application by any interested person" in this court only); Tank Level or Pressure Monitoring Devices, 64 Fed. Reg. 64,739, 64,740 (Nov. 22, 1999) (Coast Guard will take "no further action"). Our prospective jurisdiction to review the regulations was plainly defeated by the agency's action, and so we had jurisdiction under the All Writs Act. No petition for agency action was necessary to trigger our jurisdiction — under the statutory scheme, the first filing of an aggrieved party was to be in this court — and any such request would in any event have been futile, given the agency's formally announced position.

We conclude that we lack jurisdiction over Tennant's mandamus claim: Tennant has not invoked the FCC's own jurisdiction over his claims for relief, so we have no future appellate jurisdiction that a writ of mandamus could protect. For the same reason, we lack jurisdiction over his claims for injunctive relief under the All Writs Act and for a declaratory judgment, which could be entered only "[i]n a case of actual controversy within [our] jurisdiction." 28 U.S.C. § 2201(a).

**B.**

Tennant also seeks mandamus relief against the ACHP, but he points to no jurisdictional statute — and we can find none — that authorizes this court to review the Council's actions in the first instance. Mandamus jurisdiction over agency action lies, if anywhere, in the court that would have authority to review the agency's final decision. *See FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468–69 (1984); *TRAC*, 750 F.2d at 77–79; 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3942, at 796 & n.70 (1996); *cf. Ex parte United States*, 287 U.S. 241, 249 (1932) ("[A]pplication for the writ [of mandamus] ordinarily must be made to the intermediate appellate court, and made to this [C]ourt as the court of ultimate review only in . . . exceptional cases."). With respect to the ACHP, that is not us.

As for the SHPO, Tennant asks not for mandamus but rather for declaratory and injunctive relief; this court lacks jurisdiction to hear such claims in the first instance. The same is true with respect to Tennant's claims for injunctive relief against Cingular and Crown Castle.

\* \* \*

For the foregoing reasons, we dismiss the petition for lack of jurisdiction.

*So ordered.*