# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-6091

AMANDA JANE WOLFE AND PETER E. BOERSCHINGER, PETITIONERS,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, RESPONDENT.

Before GREENBERG, ALLEN, and FALVEY, *Judges.*

**O R D E R**

GREENBERG, *Judge*, filed the opinion of the Court. FALVEY, *Judge*, filed a dissenting opinion.

We consider today a petition for extraordinary relief filed by Amanda Jane Wolfe and Peter E. Boerschinger. The petition raises two claims related to Congress's command through 38 U.S.C. § 1725 that in certain circumstances the Department of Veterans Affairs (VA), reimburse veterans for the costs of their emergency medical care at non-VA facilities.[1] When petitioners Wolfe and Boerschinger each required non-VA emergency medical care and respectively sought reimbursement for a $2,354.41 coinsurance charge and a $1,340 deductible charge, respectively, VA refused to reimburse them. Those denials began the journey leading to today's decision.

Petitioner Wolfe's claim concerns the validity of a regulation VA adopted in part to implement section 1725: 38 C.F.R. § 17.1005(a)(5). In her petition she asserts the regulation is invalid and requests that the Court strike it down as inconsistent with Congress's directive. Petitioner Boerschinger's claim focuses on VA's provision misinforming veterans about this Court's interpretation of section 1725 in *Staab v. McDonald*.[2] The petition requests that the Court order VA to correct its error by, among other actions, notifying affected claimants and readjudicating affected claims. What's more, for each claim, the petition requests that the Court certify a class. Just on what we have said thus far, it should be clear that we face a complex situation procedurally, substantively, and remedially.

Because the situation is so complex, this order is necessarily lengthy and, at times, likely dense. So, to guide the journey through this order, before we consider the trees, we'll take a look at the forest—the map, the big picture. In plain English, the case boils down to this: Before *Staab*, VA wrongly interpreted and administered section 1725 by categorically denying claims for reimbursement for non-VA emergency medical care whenever a veteran had any insurance covering the service at issue. Then, in *Staab*, we authoritatively corrected VA's misunderstanding

---

[1] *See generally* Jan. 1, 2018, Amended (Am.) Petition (Pet.) for Class Relief in the Nature of a Writ of Mandamus.

[2] 28 Vet.App. 50 (2016).

of section 1725, definitively and unambiguously holding that under the statute Congress did not exclude veterans with any insurance covering a given medical service from potential reimbursement for the expense of the medical service. So far, so good. We have a court correcting an incorrect agency interpretation of a statute. This happens all the time in our system of government. But as it turns out, things took a decidedly unexpected turn.

After *Staab*, VA adopted a new regulation, purportedly to implement *Staab*. We'll assume such regulatory action was appropriate, meaning that VA had a statutory gap to fill with a regulation. As we will explain, when it adopted 38 C.F.R. § 17.1005(a)(5) in *Staab*'s wake, VA excluded from reimbursement nearly every type of expense a veteran could have incurred if he or she had insurance covering the non-emergency VA medical service at issue. *So, after* Staab*, VA adopted a regulation that functionally creates a world indistinguishable from the world* Staab *authoritatively held impermissible under the statute.* As the petitioners put it, "post-*Staab*, insured veterans are in exactly the same monetary position with respect to insured claims as they were pre-*Staab*."[3] Throughout multiple rounds of briefing and at oral argument, no one (including the Court) was able to come up with a single example of something that would not have been reimbursable pre-*Staab* that is reimbursable post-*Staab*. The Secretary failed to provide an example in his initial response to the amended writ petition; at oral argument; in his response to the Court's May 14, 2019, order; in his supplemental response to the May 14, 2019, order; and in his response to the Court's May 31, 2019, order. At the eleventh hour, the Secretary asserts balance billing as an example,[4] but as we'll explain later, this flimsy example can't save his thoroughly unpersuasive position. The Agency has effectively rolled back the clock and, with no transparency, essentially readopted a position we have authoritatively held inconsistent with Congress's command.

Recognizing this is what has happened is—quite frankly—startling enough. It's difficult to conceive how an agency could believe that adopting a regulation that mimics the result a Federal court held to be unlawful is somehow appropriate when the statute at issue has not changed. But there is more. Even after we decided *Staab*, and after VA dropped its appeal of *Staab*, VA was affirmatively informing veterans that they were not entitled to reimbursement for non-VA emergency medical care if they had any insurance covering the service at issue. In other words, the Agency was telling veterans that the law was exactly opposite to what a Federal court had held the law to be. Who knows how many veterans relied on such a misrepresentation—for that is what it was—in deciding not to appeal VA decisions that denied reimbursement for non-VA emergency medical care

All of this is unacceptable. And as we explain below, such an extraordinary situation demands extraordinary relief. For the reasons that follow, the Court will certify the class proposed by petitioner Wolfe concerning the invalidity of 38 C.F.R. § 17.1005(a)(5), hold the regulation unlawful, and provide relief.[5] We will also dismiss as moot petitioner Boerschinger's motion to

---

[3] Petitioners' (Pet'rs') Reply to Respondent's (Resp't's) Response (Resp.) to the Court's May 31, 2019, Order at 4.

[4] Resp't's Sur-Response to the Court's May 31, 2019, Order at 2-3.

[5] To be clear, by deciding class certification and the merits of the underlying petition in a single order, the Court is not adopting a general policy or framework for deciding such matters concurrently in future cases. However, given the unique circumstances surrounding this case, particularly the nature of the alleged injury and the need for

certify a class, though, as we will explain, as part of our order in the Wolfe class we will effectively provide the substance of the relief he seeks.

We take one last look at the map. On our journey, we will first discuss statutes, regulations, and caselaw, as well as the facts of the petitioners' claims. Next, we will consider our jurisdiction. On that question, we'll conclude we lack jurisdiction over petitioner Boerschinger's claim because his claim no longer involves a live case or controversy. But, we will explain why we have jurisdiction over petitioner Wolfe's claim. After we dispense with these critical jurisdictional issues, we will consider whether we should certify a class concerning petitioner Wolfe's claim. We will conclude that a class is appropriate under the circumstances we face. Then, we will consider whether the class prevails under the demanding standard governing issuing extraordinary writs. We will conclude the class is entitled to a writ here. And finally, we will turn to the remedy called for by the facts.

---

prompt remedial action, the Court has concluded that resolving both matters in a single order is appropriate here. *See Godsey v. Wilkie*, 31 Vet.App. 207, 214 ( 2019) (citing *Quinault Allottee Ass'n & Individual Allottees v. United States*, 453 F.2d 1272, 1276 (Fed. Cl. 1972) (deciding requests for class certification on a case-by-case basis, "gaining and evaluating experience" on an ad hoc basis before adopting general class certification rules)).

# TABLE OF CONTENTS

I. BACKGROUND......................................................................................................... 5

    A. The Statutory and Regulatory Framework and *Staab*............................................. 5

    B. Petitioners' Facts and Procedural History ........................................................... 10

II. JURISDICTION ...................................................................................................... 13

    A. Boerschinger Class................................................................................................ 13

    B. Wolfe Class .......................................................................................................... 15

III. THE WOLFE CLASS............................................................................................. 19

    A. Certification .......................................................................................................... 19

        *i. Numerosity*...................................................................................................... 20

        *ii. Commonality*................................................................................................. 20

        *iii. Typicality*.................................................................................................... 222

        *iv. Adequacy of Representation*........................................................................ 23

        *v. Federal Rule of Civil Procedure 23(b)* ....................................................... 244

        *vi. Adequacy of Class Counsel Under Federal Rule of Civil Procedure 23(g)* ................. 255

        *vii. Superiority*.................................................................................................. 26

        *viii. Opt-Out and Notice*................................................................................... 27

        *ix. Certification of the Class* ............................................................................ 27

    B. Merits of the Class Petition .................................................................................. 28

        *i. Clear and Indisputable Right to the Writ*...................................................... 28

        *ii. Lack of Adequate Alternative Means*........................................................... 333

        *iii. Circumstances Warranting a Writ*.............................................................. 34

    C. Remedy................................................................................................................. 34

# I. BACKGROUND

## A. The Statutory and Regulatory Framework and *Staab*

Where we've been says a lot about where we're going. Two decades ago, Congress enacted section 1725 to reimburse veterans for expenses associated with emergency medical care provided by non-VA facilities.[6] But under the statute's original version, VA didn't reimburse veterans "if [they] ha[d] third-party insurance that pa[id] *any portion* of the costs associated with such emergency treatment."[7] "To address this problem," in 2010 Congress amended section 1725 to "allow the VA to reimburse veterans for treatment in a non-VA facility if they have a third-party insurer that would pay a portion of the emergency care."[8]

Congress carried out this aim, in part, by striking "or in part" from section 1725(b)(3)(C), which provided: "A veteran is personally liable for emergency treatment furnished the veteran in a non-Department facility if the veteran has no other contractual or legal recourse against a third party that would, in whole *or in part*, extinguish such liability to the provider[.]"[9] Accompanying Congress's main objective was an exclusion: "The Secretary may not reimburse a veteran under this section for any copayment or similar payment that the veteran owes the third party or for which the veteran is responsible under a health-plan contract."[10] Though not immediately important, this statutory exclusion will star later.

In 2012, VA amended its implementing regulations "to conform" to Congress's 2010 amendment of section 1725.[11] But VA rejected a commenter's suggestion that "[VA] remove the

---

[6] Veterans Millennium Health Care and Benefits Act, Pub. L. No. 106-117, § 111(a), 113 Stat. 1545, 1553-56 (1999).

[7] H.R. REP. No. 111-55, at 2 (2009), *as reprinted in* 2009 U.S.C.C.A.N. 1478, 1479 (emphasis added).

[8] *Id.* at 3.

[9] *Id.* at 2 (emphasis added).

[10] Expansion of Veteran Eligibility for Reimbursement, Pub. L. No. 111-137, § 1(b), 123 Stat. 3495, 3495 (2010). Note that the following exchange that took place during a legislative hearing indicates that Congress intended (with no plain language to contradict this intent) that VA reimburse deductibles:

> Mr. MILLER. Is it the intent of this bill for VA payment to fully extinguish the veteran's responsibility to the provider so that the veteran wouldn't be liable for any outstanding balance and at the same time, would the VA be required to cover any co-payments or deductible that the veteran may owe to a third payer?
>
> . . . .
>
> Ms. WIBLEMO. The original intent would be for the VA to cover what was not covered by the partial coverage of whatever third-party insurance they had. That was the original intent.
>
> Mr. MILLER. Including deductibles, right?
>
> Ms. WIBLEMO. That is right.

*Legislative Hearing on H.R. 4089, H.R. 4463, H.R. 5888, H.R. 6114 & H.R. 6122: Hearing Before the Subcomm. on Health of the H. Comm. on Veterans' Affairs*, 110th Cong. 3 (2008).

[11] Payment or Reimbursement for Emergency Services for Nonservice-Connected Conditions in Non-VA

---

term 'or in part' from . . . § 17.1002(f),"[12] which at the time stated: "The veteran has no coverage under a health-plan contract for payment or reimbursement, in whole *or in part*, for the emergency treatment."[13] VA explained that § 17.1002(f)'s statutory authority was section 1725(b)(3)(B), not (b)(3)(C). [14] VA considered this distinction significant because, though it acknowledged the removal of "or in part" from (b)(3)(C), it noted that Congress hadn't revised subsection (b)(3)(B).[15] VA further explained that "[t]he current language of § 17.1002(f) clarifies the language of section 1725(b)(3)(B) by reiterating the veteran's liability for emergency treatment if such veteran has no health-plan contract 'in whole or in part.'"[16] Thus, VA explicitly declined to change 38 C.F.R. § 17.1002(f).[17] Curiously, the Agency noted that the suggested change to § 17.1002(f) would result in "treat[ing] a veteran with some coverage under a health-plan contract in the same manner as one without coverage,"[18] insinuating that Congress didn't intend such a result.

Before we turn to how we dealt with this situation in *Staab,* let's make clear how VA operated under its regulation in the pre-*Staab* world: Assume a veteran was insured for the expense of a particular service (say, the basic emergency room charge) and that he or she met all other reimbursement criteria. After the veteran's primary insurer evaluated the veteran's medical bills and paid for covered claims, VA would evaluate the bills, distinguishing between services covered and those not covered by other insurance.[19] VA would pay "for services not covered in any proportion by the veteran's primary insurance."[20] As for the covered services (the basic emergency room charge in our example), VA would categorically deny "any emergency-treatment claims . . . solely because of the presence of other health insurance pursuant to [§] 17.1002(f)."[21] VA's threshold finding of insurance coverage for any one individual claim meant VA would deny that claim and would suspend any further inquiry into a veteran's remaining liability on that claim.[22] This practice seemed at odds with what Congress did in its 2010 amendments to section 1725. Not surprisingly, a veteran, Mr. Staab, challenged this system.

In 2016, this Court decided *Staab* and in doing so clearly told VA that its reading of section 1725 was wrong. We interpreted section 1725(b)(3)(B) "to contemplate a situation when coverage

---

Facilities, 77 Fed. Reg. 23,615 (Apr. 20, 2012).

[12] *Id.* at 23,616.

[13] 38 C.F.R. § 17.1002(g) (2011) (emphasis added). As VA notes in its rulemaking, "the commenter referred to § 17.1002(g)," but "the December 21, 2011, rulemaking redesignated paragraph (g) as paragraph (f)." 77 Fed. Reg. at 23,616.

[14] 77 Fed. Reg. at 23,616.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *See* Resp't's Resp. to the Court's May 31, 2019, Order at 7.

[20] *Id.*

[21] *Id.* at 5-6.

[22] *See id.*; *see also* Pet'rs' Reply to Resp't's Resp. to the Court's May 31, 2019, Order at 2-4.

under a health-plan contract would wholly extinguish a veteran's financial liability."[23] In other words, we said VA would not reimburse the veteran only when other insurance extinguished all liability. Therefore, we concluded that § 17.1002(f) overly restricted eligibility in light of the statute because § 17.1002(f) still excluded veterans with some coverage, something Congress had now prohibited.[24] In short, we held § 17.1002(f) invalid because it was inconsistent with the amended section 1725 and Congress's unambiguous language showing Congress intended that "veterans be reimbursed for the portion of their emergency medical costs that is not covered by a third-party insurer and for which they are otherwise personally liable."[25] To be clear, this means *Staab* recognized that Congress did not mean to prevent reimbursement where a veteran has insurance covering some portion of the expense for a certain service and still bears costs related to that service.

The Secretary appealed *Staab* to the U.S. Court of Appeals for the Federal Circuit (Federal Circuit). While the appeal was pending, then-Secretary of the Department of Veterans Affairs, Dr. David Shulkin, appeared at a hearing before the U.S. Senate Committee on Veterans' Affairs.[26] Asked how VA was dealing with *Staab*, Dr. Shulkin stated that "[VA] ha[d] completed all of the regulations to be able to move forward with payment of the *Staab* claims, and . . . ha[d] . . . transmitted them to the Office of Management and Budget."[27] The Secretary also stated that he was voluntarily withdrawing the Agency's appeal of *Staab*.[28] On July 17, 2017, the Federal Circuit dismissed the appeal of *Staab*, and the Court's precedential decision became final. To be clear, our decision in *Staab* was then—and is now—the definitive and authoritative interpretation of section 1725 for purposes of considering the petition before us.

In the wake of *Staab*, VA ceased processing "all affected claims," while it revised its emergency medical care regulations.[29] In the public notice of these revisions, VA acknowledged that "[t]he purpose of this rulemaking is to amend the pertinent VA regulations to comply with [*Staab*]."[30] This bears repeating: VA stated it was amending its regulations to comply with *Staab*. Two portions of the regulatory changes are relevant to this petition, though the second one is more directly on point. First, VA amended § 17.1002(f) to align the regulation with Congress's direction

---

[23] *Staab*, 28 Vet.App. at 54.

[24] *See id.* at 54-55.

[25] *Id.* at 55.

[26] *Fiscal Year 2018 Budget for Veterans' Programs: Hearing before the S. Comm. on Veterans' Affairs*, 115th Cong. (2017).

[27] *Id.* at 72 (statement of David Shulkin, M.D., Secretary of Veterans Affairs).

[28] *Id.*

[29] Reimbursement of Emergency Treatment, 83 Fed. Reg. 974, 974-80 (Jan. 9, 2018).

[30] *Id.* at 975. Note that, despite Congress's urging the Secretary in 2010 "to use the discretionary authority provided by [Pub. L. No. 111-137] to reimburse veterans for emergency treatment provided prior to the date of enactment who have been financially harmed under the VA's current non-reimbursement policy," H.R. REP. No. 111-55, at 3, VA established April 8, 2016, the date of the *Staab* decision, as the revisions' effective date. 83 Fed. Reg. 975 (citing *Jordan v. Nicholson*, 401 F.3d 1296 (Fed. Cir. 2005); *Disabled Am. Veterans v. Gober*, 234 F.3d 682, 697-98 (Fed. Cir. 2005)).

7

that veterans would be eligible for reimbursement unless they had third-party insurance that would fully extinguish their personal liability for the emergency care.[31] The new subsection (f) states that payment will be made only if "[t]he veteran does not have coverage under a health-plan contract that would *fully extinguish* the medical liability for the emergency treatment."[32] So far so good, because this language is fully consistent with what in *Staab* we held the statute means.

The second regulatory change relates specifically to the statutory exclusion (added in 2010) in section 1725(c)(4)(D), that is, the thing that can't be reimbursed. When allowing reimbursement where the veteran's insurance partially covers an expense, in section 1725(c)(4)(D), Congress also stated: "The Secretary may not reimburse a veteran under this section for any copayment or similar payment that the veteran owes the third party or for which the veteran is responsible under a health-plan contract."[33] "*Because* [after *Staab*] VA [would] provide payment or reimbursement on claims involving partial payment by a health-plan contract," VA revised 38 C.F.R. § 17.1005 by adding subsection (a)(5) (which "restate[d]" an old version of § 17.1005(f)[34]) [35]:"VA will not reimburse a veteran under this section for any copayment, deductible, coinsurance, or similar payment that the veteran owes the third party or is obligated to pay under a health plan contract."[36] This regulation was supposedly meant to implement the statutory exclusion in section 1725(c)(4)(D) and presents the central question before us.[37] As we will explain, the central question is whether the inclusion in the regulation of "deductible" and "coinsurance" is consistent with the statute's prohibition on reimbursement of "any copayment or similar payment."

Before we move on, let's take a moment to assess this history and how the parties see it. In the post-*Staab* world, everyone agrees VA still pays "for services not covered in any proportion by the veteran's primary insurance,"[38] which is to say VA didn't change from the pre- to post-*Staab* world. [39] According to the Secretary, here's how *Staab* changed the system: VA no longer automatically denies veterans' claims for covered services; instead, "VA now assesses the amount the third party paid for these covered services to determine whether VA can pay any remaining liability."[40] But as we will explain below, the Secretary's view of the post-*Staab* world makes no practical difference because, with one possible exception that the Secretary proffered late in the

---

[31] 83 Fed. Reg. 975.

[32] 38 C.F.R. § 17.1002(f) (2019) (emphasis added).

[33] Pub. L. No. 111-137, § 1(b), 123 Stat. 3495 (enacting 38 U.S.C. § 1725(c)(4)(D)).

[34] Note that old § 17.1005(f) (2017) didn't mention coinsurance: "VA will not reimburse a claimant under this section for any deductible, copayment or similar payment that the veteran owes the third party."

[35] 83 Fed. Reg. 975 (emphasis added in quotation).

[36] 38 C.F.R. § 17.1005(a)(5) (2019). We will discuss below the important differences between these types of "cost sharing" insurance terms.

[37] 83 Fed. Reg. 974-80.

[38] Resp't's Resp. to the Court's May 31, 2019, Order at 7.

[39] Pet'rs' Reply to Resp't's Resp. to the Court's May 31, 2019, Order at 3.

[40] Resp't's Resp. to the Court's May 31, 2019, Order at 6; *see id.* at 8.

game,[41] it's not clear what expense VA could reimburse now under VA's interpretation that VA would not have reimbursed before.

And this tracks petitioner Wolfe's view as well. She alleges that VA functionally operates just as it did before *Staab*. She says, for covered services, the only potentially "remaining liability" (i.e., the only potentially reimbursable expense that an insured veteran could owe after insurance covers a service) takes the form of copayments, deductibles, or coinsurance.[42] And § 17.1005(a)(5) states that VA won't reimburse "any copayment, deductible, coinsurance, or similar payment." Therefore, petitioner Wolfe says, post-*Staab* VA functions no differently than pre-*Staab* VA because veterans have *no other remaining liability for covered services* and so receive no reimbursements for those services.[43]

Ostensibly responding to the petitioner's no-other-remaining-liability point, the Secretary insists that other reimbursable costs do exist that insured veterans could owe—namely, costs for services that insurance doesn't cover.[44] By this, the Court (and apparently, the petitioners[45] too) understand the Secretary to suggest that VA's reimbursement of services *not covered* by other insurance qualifies as reimbursement of "remaining liability" on *covered* services. At oral argument, the petitioners called this a "sleight of hand,"[46] and, as we explain in more detail below, we think that characterization warranted at worst. At best, the Secretary appears to fundamentally misunderstand his own system. Focusing solely on *covered* services, the Secretary had failed to identify any other cost to a veteran constituting potentially reimbursable "remaining liability" besides copayments, coinsurance, or deductibles, despite the petitioners' prodding and the Court's multiple attempts to give him an opportunity to do so.[47] Until his fifth substantive brief (not to mention oral argument), that is. More than 9 months after the original petition came to this Court, the Secretary asserts for the first time that balance billing is an example of a cost representing potentially reimbursable "remaining liability."[48] As we'll explain later, we're dubious of this position's viability. Not to put too fine a point on it, if the Secretary is correct, VA has been able to recreate the regime the Court held unlawful in *Staab*. We can't allow that to happen.

---

[41] *See* Resp't's Sur-Response to the Court's May 31, 2019, Order at 2-3.

[42] *E.g.*, Oral Argument at 17:33-20:17, *Wolfe v. Wilkie*, U.S. Vet. App. No. 18-6091 (oral argument held May 14, 2019), https://www.youtube.com/watch?v=rtOGLFyVGqc [hereinafter O.A.].

[43] *Id.*

[44] *Id.* at 34:46-36:18.

[45] *See* Pet'rs' Reply to Resp't's Resp. to the Court's May 31, 2019, Order at 3 n.1.

[46] O.A. at 1:34:21-:23. For context, *see* O.A. at 1:33:07-:37:35.

[47] Pet'rs' Reply to Resp't's Resp. to the Court's May 31, 2019, Order at 2. Not only that, but when the Secretary pointed out, with respect to petitioner Boerschinger, that "Medicare Part A *partially* paid one of [his] claims," he also acknowledged that "Mr. Boerschinger's *only* personal liability after payment by Medicare Part A and VA was his cost-share obligation with respect to the one service Medicare Part A paid for." Resp't's Resp. to Court's May 31, 2019 Order, at 8.

[48] Resp't's Sur-Response to the Court's May 31, 2019, Order at 2-3.

Now that we've surveyed the system and the parties' views on the issues, let's turn to the petitioners and the history of this case.

## B. Facts and Procedural History

In September 2016, petitioner Wolfe received emergency care at a non-VA facility.[49] She incurred $22,348.25 in expenses.[50] After her insurance paid its share, she still owed $2,558.54.[51] Of this amount, $202.93 was a "copayment," and $2,354.41 was "coinsurance."[52]

Petitioner Wolfe filed a claim for reimbursement. VA denied her claim on February 2, 2018, because "'[p]rior payer's . . . patient responsibility (deductible, coinsurance, co-payment) [is] not covered.'"[53] She filed a Notice of Disagreement (NOD) in July 2018, arguing that "[VA's] policy of denying reimbursement for deductibles and coinsurance, as expressed in 38 C.F.R. § 17.1005(a)(5), is at odds with the plain meaning of 38 U.S.C. § 1725(c)(4)(D), its legislative history, . . . policy interests in favor of expanding veterans' benefits," and *Staab*.[54] VA replied to her NOD on August 14, 2018, in a letter stating: "Due to the volume of appeals, we anticipate a delay."[55] At VA's request, petitioner Wolfe filed an amended NOD in the form of a letter, repeating her earlier arguments.[56] VA eventually responded with a November 20, 2018, letter: "Our decision is final; appeal closed."[57] Petitioner Wolfe filed her initial petition with the Court on October 30, 2018.

Meanwhile, petitioner Boerschinger also received emergency care at a non-VA facility.[58] Medicare had paid some of his bill; afterwards, he still owed $1,340, which he paid.[59] This amount was a "deductible" that he owed under Medicare Part A.[60]

Petitioner Boerschinger filed a claim for reimbursement. On November 27, 2018, VA denied his claim, citing § 17.1002 and finding that he "ha[d] other insurance coverage eligible to make payment on the claim. The veteran must not have coverage under a health-plan contract for

---

[49] Am. Pet. at 9.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.* at 10; *id.* Exhibit (Ex.) E at 35.

[54] *Id.* at 10; *id.* Ex. F at 42.

[55] *Id.* at 10; *id.* Ex. G at 44.

[56] *Id.* at 10 n.1; *id.* Ex. H at 46.

[57] *Id.* at 10. Note, though, that the amended petition doesn't offer this letter in an exhibit.

[58] *Id.* at 11.

[59] *Id.*

[60] Resp't's Resp. to Pet'rs' Am. Pet. for Class Relief in the Nature of a Writ of Mandamus at 6.

payment or reimbursement, in whole or in part, for the emergency treatment."[61] Further, VA listed eligibility criteria, including the criterion that "the veteran has no coverage under a health plan contract."[62] Of course, this statement is utterly inconsistent with *Staab*.

On January 1, 2019, petitioner Wolfe requested leave to file an amended petition seeking to join Mr. Boerschinger as a petitioner.[63] On February 1, 2019, the Court granted petitioner Wolfe's motion and allowed the amended petition.[64]

More facts came to light in the Secretary's response to the amended petition. At first glance, they're relevant to the Boerschinger Class exclusively, but as we'll see, they relate to the Wolfe Class too. The Secretary conceded that after *Staab* VA didn't update its templates for letters denying reimbursement for emergency medical care.[65] Thus, he essentially conceded legal error. However, he also provided evidence that VA is in the process of correcting the faulty notice, renotifying veterans whose claims were denied, and correcting its templates.[66] The Secretary stated that VA has divided veterans who were denied reimbursement and provided with faulty notice into three categories.[67] Category A includes claimants whose claims were incorrectly denied based on other health insurance (OHI) and who received notices to that effect.[68] Category B includes claimants whose claims were denied for reasons other than the presence of OHI but who received notices that potentially contained erroneous language regarding OHI.[69] Category C includes claimants whose claims were rejected as incomplete (not denied) but who received notices that potentially contained erroneous language regarding OHI.[70]

On May 14, 2019, the Court held oral argument. From the bench, the Court ordered the Secretary to provide the updated letter templates that VA is sending to claimants and information about which appellate path (the "Legacy" or the "Appeals Modernization Act" (AMA)[71] path) VA would process claims under when upon claimants had received their revised letters and their extended appeal windows.[72]

---

[61] Am. Pet. at 11; *id.* Ex. I at 48.

[62] *Id.* at 11; *id.* Ex. I at 48.

[63] Pet'r's Motion (Mot.) for Leave to File an Am. Pet. for Class Relief in the Nature of a Writ of Mandamus and Join an Additional Pet'r at 1.

[64] *Wolfe v. Wilkie*, U.S. Vet. App. No. 18-6091, at 4-5 (Feb. 1, 2019, Order).

[65] Resp't's Resp. to Am. Pet. 52.

[66] *Id.* Ex. 1 ¶ IV ("Corrective Actions").

[67] *Id.* at 53-54; *id.* Ex. 1 ¶ IV.a.-c.

[68] *Id.* at 53; *id.* Ex. 1 ¶ IV.a.

[69] *Id.* at 54; *id.* Ex. 1 ¶ IV.b.

[70] *Id.* at 54; *id.* Ex. 1 ¶ IV.c.

[71] *See* Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55, 131 Stat. 1105 (Aug. 23, 2017).

[72] *Wolfe v. Wilkie*, U.S. Vet. App. No. 18-6091 (May 14, 2019, Bench Order).

11

The same day, the Secretary provided the updated templates. The letter template for Category A generally acknowledges error but strangely doesn't say what the error was.[73] Recall that veterans in Category A are veterans who were denied reimbursement solely because they had OHI. The second template, for Category B, acknowledges a "misstatement," specifies that VA misstated section 1725's requirements related to OHI, and explains the error.[74] The template for Category C mirrors that for Category B in explaining the error.[75] Finally, we must keep in mind that the templates for Categories A and C (but not B) contain the following language: "It is important to note that VA has no legal authority to pay a Veteran's cost shares, deductibles, or copayments associated with their other health insurance."[76] The Secretary stated in his response he would process Category A and C claims under the AMA and Category B claims as Legacy appeals.[77] But this information is nowhere in the updated letter templates.

On May 31, 2019, the Court ordered the Secretary to provide more information on the reimbursement system for emergency non-VA medical services, its history, and the number of claimants in each of the three categories into which he divided veterans who had received some form of defective notice about section 1725. In response to that order, the Secretary provided data on claims processing under section 1725 from October 2009 through June 2019 but tied no clear arguments to that data.[78] We can't summarize the information much more succinctly than the petitioners did in a reply the Court allowed them to file:

> [The Secretary's] exhibits indicate that *Staab* has had no impact on the aggregate reimbursements made by VA under [s]ection 1725. [The Secretary's] Exhibit 1 shows that during the period VA suspended the processing of claims affected by *Staab*—from the third quarter of FY 2016 through the first quarter of FY 2018— VA's quarterly payments under [s]ection 1725 ranged from $95 to $120 million. Exhibit 2 shows that during the second quarter of FY 2018 (January through March 2018), when VA ended its moratorium and began implementing the regulation challenged in this case, VA processed 1.9 million claims—a massive increase compared to the quarterly figures for previous quarters.[] If *Staab* affected the amount of payments VA made, then one would expect a major increase in VA payments under [s]ection 1725. Yet, Exhibit 1 shows that in the same quarter that VA processed 1.9 million claims, *its aggregate quarterly payments were no more* than during each of the three prior quarters when the moratorium was in effect. Exhibit 1 also shows that there has been almost no change in the total amount of money reimbursed per quarter following VA's implementation of *Staab* and the Regulation, and VA's Response does not suggest otherwise. Thus, Exhibits 1 and 2

---

[73] Resp't's Resp. to the Court's May 14, 2019, Order, Ex. 1 (Category A template).

[74] *Id.* Ex. 2 (Category B template)

[75] *Id.* Ex. 3 (Category C template).

[76] *Id.* Ex. 1 (Category A template), Ex. 3 (Category C template).

[77] Resp't's Supplemental (Supp.) Resp. to the Court's May 14, 2019, Order at 1-2.

[78] *See generally* Resp't's Resp. to the Court's May 31, 2019, Order.

are entirely consistent with Petitioner's argument that there has been zero monetary impact to veterans as a result of *Staab*.[79]

This data seems to fly in the face of "[t]he Secretary's 2016 prediction that [*Staab*] would have a substantial monetary impact on the reimbursement system for emergency treatment at non-VA facilities for non-service-connected conditions," which the Secretary now says was "wrong."[80] He doesn't mention, though, that his prediction is only "wrong" because of § 17.1005(a)(5)'s effect.

As for the number of claimants in each of the three categories, the Secretary supplied the following information from VHA: "There are 42,050 veterans in Category A, . . . . 348,608 veterans in Category B, . . . . [and] 229,990 veterans in Category C."[81] Thus, there are over 600,000 veterans affected just by VA's past actions concerning the matters before the Court.

Now that we have the facts on the table, we can turn to our analysis, starting with jurisdiction.

## II. JURISDICTION

Before we can address either the merits of the amended petition or the potential class certification, we must first consider whether we have jurisdiction to do what the petitioners ask.[82] Even if the Secretary was silent on the question of jurisdiction, we would discuss it because we have an "independent obligation to police [our] own jurisdiction."[83] We "must raise and decide jurisdictional questions that the parties either overlook or elect not to press."[84] The Secretary argued that we lack jurisdiction over both classes. We address each class in turn. In sum, we lack jurisdiction over the Boerschinger Class but have jurisdiction over the Wolfe Class.

### A. Boerschinger Class

Petitioner Boerschinger requests certification of a class of veterans "who[] have been or will be harmed by the VA in that the VA has sent them correspondence regarding their claims for reimbursement of emergency medical expenses incurred at non-VA facilities stating, incorrectly, that one criterion for reimbursement is that the veteran have 'no coverage under a health plan contract.'" [85] On behalf of himself and those similarly situated veterans (collectively, the "Boerschinger Class"), Petitioner Boerschinger asks the Court to

---

[79] Pet'rs' Reply to Resp't's Resp. to the Court's May 31, 2019, Order at 5 (emphasis in original).

[80] Resp't's Sur-Response to the Court's May 31, 2019, Order at 1.

[81] Resp't's Resp. to Court Order of May 31, 2019, at 10.

[82] We note that, at times, the Secretary conflates the concepts of jurisdiction and substantive entitlement to a writ. *See* Resp't's Resp. to Am. Pet. at 8. We address jurisdiction—that is, the power of the Court to act—here. We return below to the analytically distinct question of entitlement to the writ.

[83] *Sellers v. Shinseki*, 25 Vet.App. 265, 274-75 (2012); *see Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011); *Demery v. Wilkie*, 30 Vet.App. 430, 434 (2019).

[84] *Henderson*, 562 U.S. at 434.

[85] Am. Pet. at 3.

1. Invalidate the Secretary's decisions to the extent they denied reimbursement to Boerschinger Class members for medical expenses because they have insurance coverage;

2. Order the Secretary to readjudicate these reimbursement claims under section 1725(c)(4)(D)'s proper interpretation;

3. Enjoin the Secretary from issuing any communication to veterans that incorrectly states that one of the criteria for reimbursement is that the veteran has no coverage at all under any health plan contract;

4. Order the Secretary to re-issue all communications, sent to claimants since the Court's precedential opinion issued in *Staab* (on April 8, 2016), that incorrectly stated that one of the criteria for reimbursement is that the veteran have no coverage at all under a health plan contract;

5. Order the Secretary to [reset] the deadlines applicable to veterans who received this correspondence for appealing any VA denial of their reimbursement claims; and

6. Order such other relief as may be appropriate in the interest of justice and in aid of the Court's jurisdiction.[86]

The Secretary has provided, or is in the process of providing, the proposed Boerschinger Class all its requested relief. He's claimed to have stopped sending communications to veterans that incorrectly state that one of the criteria for reimbursement is that the veteran has no coverage at all under any health plan contract.[87] He's sending out letters that correct the specific error identified in the Boerschinger portion of the petition informing veterans that VA will readjudicate claims for which they were denied reimbursement because they have insurance coverage and will reset the applicable deadlines for appealing denials of claims.[88]

This Court adheres to the case-or-controversy jurisdictional requirements imposed by Article III of the U.S. Constitution.[89] A case or controversy ceases to exist, and a case becomes moot, "'when the issues presented are no longer "live" or the parties lack a legally cognizable

---

[86] *Id.* at 3-4.

[87] O.A. at 1:07:47-:08:23.

[88] Resp't's Resp. to the Court's May 14, 2019, Order, Exs. 1, 2, 3 (Categories A, B, and C templates). Of course, as we will explain below, two of those letters ultimately are defective to the extent they inform veterans that VA will not reimburse a veteran for coinsurance or deductibles. But the correction of that error can best be dealt with as part of the relief provided to Ms. Wolfe and the class we will certify for her portion of the petition.

[89] *Cardona v. Shinseki*, 26 Vet.App. 472, 474 (2014) (per curiam order); *Mokal v. Derwinski*, 1 Vet.App. 12, 13 (1990).

interest in the outcome.'"[90] When a case becomes moot during the course of litigation, the proper outcome is to dismiss the case for lack of jurisdiction, unless an exception to mootness applies.[91]

Because Petitioner Boerschinger and his proposed class have received or are receiving the requested relief, there's no longer a case or controversy with respect to the Boerschinger Class issues. Therefore, the Court will dismiss those portions of the amended petition for lack of jurisdiction.

### B. Wolfe Class

On the other hand, we have jurisdiction to act with respect to the Wolfe Class for the following reasons. The Secretary's arguments to the contrary are not persuasive.

Petitioner Wolfe asks us to certify a class of veterans "who[] have been or will be harmed by the Secretary's unlawful regulation in that the VA has already denied or will deny in the future, in whole or in part, their claims for reimbursement of emergency medical expenses incurred at non-VA facilities on the ground that the expenses are part of the deductible or coinsurance payments for which the veteran was responsible."[92] There is no question that Ms. Wolfe's claim presents a live case or controversy. She was denied reimbursement for non-VA medical services based on what she asserts is an unlawful regulation. As we will explore, the jurisdictional question for her focuses on the method by which she seeks to vindicate her rights.

Petitioner Wolfe seeks relief under the All Writs Act (AWA), which provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdiction."[93] But the AWA standing alone cannot support our jurisdiction.[94] As its plain language indicates, that statute is designed to *aid* jurisdiction a court otherwise possesses. "However, [AWA] jurisdiction extends beyond pending cases; it embraces the prospective and potential jurisdiction of a court as well."[95] A court may use this AWA power "'where an appeal is not then pending but may be later perfected.'"[96] As we have noted before, "if [our] granting of the petitioner's petition would lead to a [Board] decision over which [we] would have jurisdiction

---

[90] *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

[91] *See Browder v. Shulkin*, 29 Vet.App. 170, 172 (2017) (per curiam); *Fabio v. Shinseki*, 26 Vet.App. 404, 405 (2013). There is an exception to mootness related to putative class actions for claims that are "inherently transitory." *See Godsey*, 31 Vet.App. at 218. The aim of this exception is, in essence, to prevent a defendant (in district courts) from mooting a class action by providing relief to the named plaintiff. *Id.* That is not what happened here. The Secretary's actions resolved the error for all members of the putative Boerschinger Class. Therefore, the inherently transitory exception to mootness does not apply on the facts before us.

[92] Am. Pet. at 2.

[93] 28 U.S.C. § 1651(a).

[94] *See Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998); *Heath v. West*, 11 Vet.App. 400, 402-03 (1998).

[95] *Erspamer v. Derwinski*, 1 Vet.App. 3, 8 (1990).

[96] *FTC v. Dean Foods Co.*, 384 U.S. 597, 603-04 (1966) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943)).

[under 38 U.S.C. § 7252(a)], [we] would possess jurisdiction to issue a writ of mandamus."[97] In other words, we have jurisdiction under the AWA where we would otherwise "be prevented or frustrated from exercising [our] statutorily granted jurisdiction over a Board decision."[98] And in this regard it bears emphasis that we need not be certain about what the future will hold. Jurisdiction under the AWA may be proper to entertain a petition in aid of prospective appellate jurisdiction where it is "impossible . . . to predict what course petitioner's claim might follow in the future" and "there is nothing to be gained by engaging in such an exercise."[99] "[I]t is sufficient to note only that the [alleged VA inaction] directly and adversely effects [our] potential and prospective appellate jurisdiction."[100]

Congress intended the AWA to function very much at courts' discretion, trusting courts to utilize the AWA to respond to unusual situations flexibly as circumstances warrant.[101] "It permits federal courts to fill gaps in their judicial power where those gaps would thwart the otherwise proper exercise of their jurisdiction."[102] Though there are "traditional" applications of mandamus, "[s]ome flexibility is required if the extraordinary writ is to remain available for extraordinary situations."[103]

A variety of circumstances, ranging from innocent inefficiency to egregious interference, may call for writs under the AWA to protect our prospective jurisdiction. For example, where VA fails or refuses to adjudicate a claim presented, we have the authority to direct the Secretary to act on that claim.[104] The reason is simple: if the Agency never acts, we could never exercise our jurisdiction. The same would be true if the Agency sought "to restrict [our] jurisdiction . . . through intimation."[105] In that case, we "would have jurisdiction [under the AWA] to issue an injunction in defense of our jurisdiction."[106]

Under this well-established AWA law concerning the protection of prospective jurisdiction and based on the particular facts before us, we conclude that we have jurisdiction to provide the

---

[97] *In re Fee Agreement of Cox*, 10 Vet.App. 361, 371 (1997), *vacated on other grounds sub nom. Cox v. West*, 149 F.3d 1360 (Fed. Cir. 1998).

[98] *In re Fee Agreement of Wick*, 40 F.3d 367, 373 (Fed. Cir. 1994); *see also Erspamer*, 1 Vet.App. at 8 ("[AWA] jurisdiction is particularly applicable where . . . an alleged [act or] refusal to act would forever frustrate the ability of a court to exercise its appellate jurisdiction.")

[99] *Erspamer*, 1 Vet.App. at 9.

[100] *Id.*

[101] *See Monk v. Shulkin*, 855 F.3d 1312, 1318 (Fed. Cir. 2017) ("*Monk II*").

[102] *Id.*

[103] *In re Sch. Asbestos Litig.*, 977 F.2d 764, 773 (3d Cir. 1992).

[104] *See Cox*, 149 F.3d at 1362-63; *In re Fee Agreement of Cox*, 10 Vet.App. at 371; *see also* 38 U.S.C. § 7261(a)(2) ("[T]he Court of Veterans Appeals, to the extent necessary to its decision and when presented, shall . . . compel action of the Secretary unlawfully withheld or unreasonably delayed.").

[105] *Moore v. Derwinski*, 1 Vet.App. 83, 84 (1990).

[106] *Id.* (determining that the Court had jurisdiction over a motion for extraordinary relief independent of a pending appeal).

relief petitioner Wolfe seeks, both individually and on a class-wide basis, for two independent but related reasons. First, the regulation itself risks frustrating the exercise of our statutorily granted jurisdiction over Board decisions. Importantly, the petitioner alleges that VA promulgated this regulation to achieve the same effect that the invalid regulation in *Staab* accomplished: severely diminish or eliminate VA's responsibility for non-VA emergency care reimbursements in contravention of the statute. [107] This regulation effectively accomplishes a categorical and systematic means of communicating the futility of appealing reimbursement denials for those who have any insurance. It operates functionally the same as VA's refusal to adjudicate a claim for such people at all, just as before *Staab*, in that it stops otherwise potentially meritorious appeals from progressing through the system. [108] This is so either because the regulation is the sole basis of denial or it creates a chilling effect on claimants appealing multi-bases denials. Many rationally acting claimants who have been inappropriately denied reimbursement simply won't continue with the administrative process if the regulation so categorially says they will lose at the end of the day, assuming they start the process at all given the regulation. Indeed, this regulation frustrates our jurisdiction in a much more egregious and insidious (if not as pervasive) way than delays do. After all, one could forgive a potential or denied claimant from ever challenging "the law" when VA presents it so categorically. To grant the petition and issue a writ invalidating the regulation would lead to Board decisions for the Wolfe Class members over whom we would have jurisdiction but who may never appeal because of the existence of the regulation itself.

Second, we now know that—in the notification letters seeking to address the Boerschinger Class claims—VA is affirmatively telling a wide range of past claimants who have already been the subject of unlawful administrative action under *Staab* that they won't be reimbursed for so-called "cost-sharing" devices (coinsurance and deductibles in addition to Congress's specific exclusion of copayments). [109] That is critically important because, if left uncorrected, these past claimants won't appeal or, perhaps, not even continue with a claim. If they drop out after reading the legally incorrect language in the letter, something we'll address in greater detail below, then we would never get to rule on the issue for them; we wouldn't be able to exercise jurisdiction over a portion of the class. This is yet another reason to use the writ under the particular circumstances of this case.

We are cognizant that extraordinary writs are just that—extraordinary. And though mandamus is disfavored to avoid piecemeal appeals, [110] we face a truly exceptional situation today in which the petitioner alleges that VA promulgated and uses a regulation to circumvent our *Staab* decision (or at least its effects), [111] amounting to a clear abuse of administration discretion and disrespect for judicial power and, thereby, our very constitutional separation of powers. This most

---

[107] Pet'rs' Reply to Resp't's Resp. to Am. Pet. at 8-9; *see* Am. Pet. at 1-2, 8-9, 14-17, 20-21. We have assumed the truth of allegations in a petition for assessing our jurisdiction under the AWA. *See Moore*, 1 Vet.App. at 84.

[108] *See Staab*, 28 Vet.App. at 51-52.

[109] Resp't's Resp. to the Court's May 14, 2019, Order, Exs. 1, 3 (stating in two different notification letters to claimants that "VA has no legal authority to pay a Veteran's cost shares, deductibles, or copayments associated with their other health insurance"). As we explain below, that statement is incorrect as a matter of law.

[110] *In re Sch. Asbestos Litig.*, 977 F.2d at 772 (citing *Kerr v. U.S. District Court*, 426 U.S. 394, 403 (1976)).

[111] Pet'r's Reply to Resp't's Resp. to Am. Pet. at 8-9.

certainly justifies the writ.[112] And we add that VA would continue to categorically reject a host of reimbursement claims throughout the pendency of petitioner's direct appeal without our intervention, in addition to continuing to mail claimants legally erroneous notifications. Quite simply, an extraordinary writ is appropriate when faced with such extraordinary circumstances.

Despite all of this, the Secretary insists we lack jurisdiction, so we address his concerns specifically. We do so in recognition of the importance of the issues he raises that, in some respects, go to the heart of our system of tripartite government. First, the Secretary reads section 7261(a)'s introductory language ("[i]n any action brought under this chapter [72]") to restrict our jurisdiction to performing actions listed in section 7261(a) *only* in the context of reviewing final Board decisions. This argument has no merit whatsoever. To begin with, it entirely ignores the well-established general principles concerning the protection of prospective jurisdiction we have discussed. In addition, it ignores a host of caselaw concerning claims of unreasonable delay, law that seemingly could not exist if the Secretary were correct.[113] And to top it all off, the Federal Circuit certainly seemed to assume the Court has this authority in both *Monk* and *Martin*.[114]

The Secretary also argues that 38 U.S.C. §§ 502 and 7292 provide the Federal Circuit with exclusive power to invalidate VA regulations.[115] He misunderstands those statutes' import and, thus, overstates their meaning. The Secretary forgets that "the statutory scheme as a whole, the specific context in which [a] word or provision at issue is used, and the broader context of the statute as a whole" all inform any statutory provision's plain meaning.[116] Accordingly, we construe a statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."[117]

The Secretary's reading of sections 502 and 7292(c) clashes at minimum with sections 7292(a) and 7261(a)(3), in which Congress clearly provided this Court with the power to invalidate VA regulations. Contrary to the Secretary's reading of section 502 to delineate the jurisdictional divide between this Court and the Federal Circuit, Congress seemingly intended section 502 to delineate the relationship between the Federal Circuit's jurisdiction and the federal regional circuit

---

[112] *See Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953).

[113] *See e.g.*, *Ebanks v. Shulkin*, 877 F.3d 1037 (Fed. Cir. 2017); *Cox v. West*, 149 F.3d 1360 (Fed. Cir. 1998); *Godsey*, 31 Vet.App. 207; *Figueroa v. Wilkie*, No. 18-6800, 2018 WL 6802821 (Vet. App. Dec. 27, 2018) (order); *Palmer v. Wilkie*, No. 18-5122, 2018 WL 6442949 (Vet. App. Dec. 10, 2018) (order); *Richardson v. Wilkie*, No. 18-4938, 2018 WL 6313471 (Vet. App. Dec. 4, 2018) (order); *Harvey v. Shinseki*, 24 Vet.App. 284 (2011); *Werner v. Derwinski*, 3 Vet.App. 37 (1992); *Erspamer*, 1 Vet.App. 3.

[114] *See Monk II*, 855 F.3d at 1319-20; *Martin v. O'Rourke*, 891 F.3d 1338, 1348 (Fed. Cir. 2018).

[115] Resp't's Resp. to Am. Pet. at 9.

[116] *Hornick v. Shinseki*, 24 Vet.App. 50, 52 (2010); *see also King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *Imazio Nursery, Inc. v. Dania Greenhouses*, 69 F.3d 1560, 1564 (Fed. Cir. 1995) (holding that all parts of a statute must be construed together without according undue importance to a single or isolated portion).

[117] 2A NORMAN J. SINGER ET AL., SUTHERLAND ON STATUTORY CONSTRUCTION § 46:6 (7th ed. 2007) [hereinafter SUTHERLAND]; *see Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000).

18

courts of appeal and district courts' jurisdiction.[118] So it doesn't seem to play the role the Secretary wants it to. And section 7292(c) must be read in conjunction with its earlier subsection (a), which is clearly premised on the fact that this Court has the power to invalidate a regulation.

Finally, and related to the Secretary's argument about the Federal Circuit's role, the petitioner argues that nothing indicates that Congress intended to remove an avenue for relief that veterans had before the enactment of the Veterans' Judicial Review Act.[119] We agree. In fact, the Federal Circuit noted that Congress seemed to intend this Court to hear challenges to VA regulations through class actions.[120]

Therefore, despite the Secretary's insistence to the contrary, we conclude, after assessing his specific objections and independently considering the matter, that we have jurisdiction to issue the writ that the Wolfe Class seeks. We now turn to class certification and then to whether the named petitioner has shown a right to the writ she seeks.

## III. THE WOLFE CLASS

### A. Certification

This Court has the "authority to certify a class for class action or similar aggregate resolution procedure."[121] The Federal Circuit declined to prescribe a specific framework for the Court to use to determine whether class certification is appropriate,[122] and, to date, the Court has not devised its own rules for certifying a class. However, in *Monk v. Wilkie*,[123] the Court determined that we would use Rule 23 of the Federal Rules of Civil Procedure (Rule 23) as a guide for deciding requests for class certification until we issue our own aggregate action rules.[124] And recently, in *Godsey v. Wilkie*, the Court fleshed out the framework for analyzing the class

---

[118] *See United States v. Szabo*, 760 F.3d 997, 1003-04 (9th Cir. 2014) (citing H.R. REP. No. 100-963, at 28 (1988) (expressing Congress's intent "to avoid the possible disruption of VA benefit administration which could arise from conflicting opinions on the same subject due to the availability of review in the 12 Federal Circuits or the 94 Federal Districts" and stating that "the subject of veteran benefits rules and policies is one that is well suited to a court which has been vested with other types of specialized jurisdiction").

[119] Petrs' Reply to Resp't's Resp. to Am. Pet. at 3-4 (citing *Monk II*, 855 F.3d at 1319-20; *Wayne State Univ. v. Cleland*, 590 F.2d 627 (6th Cir. 1978); *Nehmer v. U.S. Veterans' Admin.*, 118 F.R.D. 113 (N.D. Cal. 1987)). Indeed, such a result wouldn't jive with a set of laws intended to increase protections for veterans.

[120] *Monk II*, 855 F.3d at 1320 n.4.

[121] *Id.* at 1321.

[122] *Id*. at 1321-22.

[123] 30 Vet.App. 167, 170 (2018) ("*Monk III*").

[124] *Id.* at 170 (plurality opinion) (using Rule 23 as a guide), 184 (Allen, J., concurring in part and dissenting in part) (agreeing with the plurality on this point); *see Godsey*, 31 Vet.App. at 220 (applying Rule 23 to petitioner's request for class certification); *Thompson v. Wilkie*, 30 Vet.App. 345, 346 (2018) (same).

certification issues.[125] We therefore consider the instant request for class certification under that framework.

Under Rule 23(a), the party seeking class certification must demonstrate that

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.[126]

The party must also demonstrate that the action is maintainable as a class under Rule 23(b).[127] To do so here, the petitioners must establish that the Secretary "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[128]

Petitioner Wolfe requests certification of a class of those veterans "who[] have been or will be harmed by the Secretary's unlawful regulation in that the VA has already denied or will deny in the future, in whole or in part, their claims for reimbursement of emergency medical expenses incurred at non-VA facilities on the ground that the expenses are part of the deductible or coinsurance payments for which the veteran was responsible."[129] The Wolfe Class meets the Rule 23 requirements for class certification.

### i. Numerosity

The petitioners easily meet Rule 23(a)(1)'s requirement with potentially hundreds of thousands—if not millions—of claimants,[130] and the Secretary concedes as much.[131] No further analysis of this aspect of class certification is necessary.

### ii. Commonality

In *Wal-Mart*, the Supreme Court held that Rule 23(a)(2) requires a "common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

---

[125] 31 Vet.App. at 220-225.

[126] FED. R. CIV. P. 23(a); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

[127] FED. R. CIV. P. 23(b); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

[128] FED. R. CIV. P. 23(b)(2).

[129] Am. Pet. at 2.

[130] *See id.* at 24 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (more than 40 people in a class satisfied numerosity requirement)).

[131] Resp't's Resp. to Am. Pet. at 38.

of the claims in one stroke."[132] The Supreme Court emphasized that "'[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'"[133] The existence of even one such question is sufficient to satisfy the Rule 23(a)(2) commonality requirement.[134] "Factual and legal differences among class members' claims will prove fatal to commonality when those differences 'have the potential to impede the generation of common answers' to the questions proposed by the class.[135]

As Petitioner Wolfe argues,[136] this class meets the commonality requirement. Whether the Court should grant the writ the class members' seek "depend[s] upon a common contention"—that the regulation is invalid under section 1725—that "is capable of classwide resolution"—in the form of an order invalidating § 17.1005(a)(5), invalidating the Secretary's denials based at least in part on that regulation, and ordering the Secretary to readjudicate those claims based on section 1725's proper interpretation.[137] There aren't any factual or legal differences among the Wolfe Class members' claims that will potentially impede the common answer to the validity question.[138] It is a pure question of law.

The Secretary attempts to argue that the Wolfe Class doesn't meet the commonality standard.[139] But he misunderstands that requirement. He seems to insist that the answer alone must dispose of class members' ultimate reimbursement claims. That standard is too stringent. The purportedly invalid regulation need not serve as the only basis of denial to harm veterans. For example, a veteran could have declined to appeal a different basis for denial simply because he or she viewed the § 17.1005(a)(5) basis for denial as unassailable.

The Secretary relies heavily on the plurality's commonality analysis in this Court's 2018 *Monk* decision.[140] Initially, we note that the *Monk* plurality's commonality analysis[141] isn't precedential. Even so, this case is distinguishable. *Monk* concerned unreasonable delay and discussed how reasonableness is a necessarily factual, case-by-case inquiry.[142] In the plurality's eyes, the petitioners' failure to allege common reasons for delay and to target a "specific practice

---

[132] 564 U.S. at 350.

[133] *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

[134] *Id.* at 359.

[135] *Godsey*, 31Vet.App. at 221 (quoting *Wal-Mart*, 564 U.S. at 350) (internal quotation omitted).

[136] Am. Pet. at 25.

[137] *See Wal-Mart*, 564 U.S. at 350.

[138] *See Godsey*, 31 Vet.App. at 221 (quoting *Wal-Mart*, 564 U.S. at 350).

[139] Resp't's Resp. to Am. Pet. at 38-44.

[140] *See id.*

[141] *Monk III*, 30 Vet.App. at 175-81 (plurality opinion).

[142] *Id.*

or policy" stymied class certification.[143] But here we're talking about a facial challenge to a regulation's validity as contrary to statute. This isn't an as-applied challenge of § 17.1005(a)(5); we need look only to other law to decide § 17.1005(a)(5)'s validity. So, any differences in facts doesn't stymie certification of this class as they did in the *Monk* plurality.

Therefore, we hold that the Wolfe Class presents common questions of law sufficient to establish commonality.

### *iii. Typicality*

The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named [petitioner], and whether other class members have been injured by the same course of conduct. Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.[144]

This inquiry focuses on whether "in pursuing [her] own claims, the named [petitioner] will also advance the interests of the class members."[145] This requirement is sometimes considered to overlap with other Rule 23 requirements.[146] "[T]he typicality prong of Rule 23(a) sets a relatively low threshold."[147] Typicality is also easier to satisfy where classes seek injunctive relief.[148]

As with commonality, typicality is also satisfied here. In pursuing her claim for reimbursement of her coinsurance payment, petitioner Wolfe will also advance the interests of the class members because she's disputing § 17.1005(a)(5)'s validity, which prevents reimbursement to her, and its chilling effect on appeals, both of which affect the other class members the same way.[149] As goes her claim that the regulation is invalid, so go the class claims.[150] There's no obvious or alleged variation in claims between the petitioner and absent class members that strikes

---

[143] *Id.* at 180-81.

[144] *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks omitted); *see Robidoux v. Celani*, 987 F.2d 931, 936-38 (2d Cir. 1993) (explaining that the "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability," despite "minor variations in the fact patterns underlying individual claims").

[145] *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996).

[146] *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

[147] *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 82 (E.D. N.Y. 2007); *see, e.g.*, *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002); *Lightbourn v. Cty. of El Paso,* 118 F.3d 421, 426 (5th Cir. 1997).

[148] *See Baby Neal for and by Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994).

[149] *See In re Am. Med. Sys.*, 75 F.3d at 1082.

[150] *See Sprague*, 133 F.3d at 399.

at the heart of the respective causes of action.[151] Petitioner Wolfe's claim shares the same essential characteristics as the class claims at large.[152] Like the rest of the class members' claims, her reimbursement claim was denied at least in part because it's a non-refundable payment under the allegedly invalid regulation; thus, she shares the same injury as the other members (responsibility for payments that VA must pay under section 1725), VA's denial citing the regulation isn't unique to the petitioner, and other class members bear the burden of payments based on similar denials of reimbursement claims for which VA should be responsible.[153]

The Secretary's argument that typicality isn't satisfied [154] suffers from similar misunderstandings of Rule 23 as does his commonality argument, which we've already addressed. He argues that VA could find additional reasons to deny petitioner's reimbursement claim or could reverse denial entirely.[155] The latter "possibility" is impossible, though, because VA must follow the regulation.[156] As for the former, additional bases for denial wouldn't make petitioner atypical; her class already includes claimants whose reimbursement claims were denied on multiple bases.

We hold that Petitioner Wolfe's claims are typical of those in the Wolfe Class.


### iv. Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. '[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'"[157] "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."[158] Class representatives serve as fiduciaries for certified classes.[159]

Petitioner Wolfe satisfies the adequacy requirement. She has an interest in vigorously pursuing the invalidity argument because the success of her reimbursement claim turns on this issue, and nothing indicates that she has an interest antagonistic to the other class members'

---

[151] *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006).

[152] *See Haggart v. United States*, 89 Fed. Cl. 523, 534 (2009); *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008).

[153] *See Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

[154] Resp't's Resp. to Am. Pet. 44-47.

[155] *Id.* at 46.

[156] *See* 38 U.S.C. § 7104(c) ("The Board shall be bound in its decisions by the regulations of the Department . . . .")

[157] *Amchem*, 521 U.S. at 625-26 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

[158] *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011).

[159] *See London v. Wal-Mart Stores, Inc.* 340 F.3d 1246, 1254 (11th Cir. 2003).

interests.[160] The Secretary merely argues that petitioner's interests aren't set yet because she awaits an SOC, but for the reasons discussed in the typicality analysis, this SOC pendency doesn't concern us. The Secretary doesn't allege any other specific conflicts of interest between the petitioner and the absent class members, and we don't independently see any.[161]

We hold that Petitioner Wolfe will fairly and adequately protect the Wolfe Class's interests.

*v. Rule 23(b)*

In addition to the Rule 23(a) requirements, a party seeking class certification must also demonstrate that the proposed class is maintainable under Rule 23(b).[162] The petitioner has sought to certify a class under Rule 23(b)(2), which "permits a court to certify a case for class-action treatment if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'"[163] As the Supreme Court explained in *Wal-Mart*, "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"[164] "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."[165]

The relief that the petitioners request in this case—declaratory and injunctive relief[166]— "perforce affect[s] the entire class at once" and is, therefore, precisely the type of relief contemplated by Rule 23(b)(2).[167] The remedy of declaring the regulation invalid under the statute and ordering readjudication of the affected claims is indivisible in nature; the Court can address VA's conduct as to all the class members with a single writ in this case.[168] That the scope of effect on different class members will vary isn't an impediment; the writ will affect all class members by removing that basis of denial on the reimbursement claims. Accordingly, the Court concludes that

---

[160] *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 249.

[161] *See Amchem*, 521 U.S. at 626.

[162] *See Wal-Mart*, 564 U.S. at 345.

[163] *Monk III*, 30 Vet.App. at 181 (quoting Fed. R. Civ. P. 23(b)(2)).

[164] 564 U.S. at 360 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132)).

[165] *Id.* at 360-61.

[166] Am. Pet. at 3-4.

[167] *Wal-Mart*, 564 U.S. at 361-62.

[168] *See Wal-Mart*, 564 U.S. at 360 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

petitioner Wolfe has met her burden of demonstrating that class certification is appropriate in this case.[169]

### vi. Adequacy of Class Counsel Under Rule 23(g)

"Unless a statute provides otherwise, a court that certifies a class must appoint class counsel."[170] "When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)."[171] "The court may not appoint class counsel by default."[172]

Rule 23(g)(1) provides, in relevant part, that, in appointing class counsel, the court:

(A) must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;
(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
(iii) counsel's knowledge of the applicable law; and
(iv) the resources that counsel will commit to representing the class; [and]

(B) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.][173]

The Court is satisfied that the proposed class counsel will adequately represent the Wolfe Class. Counsel has zealously represented the petitioners by diligently and competently identifying, investigating, presenting, and defending claims for relief, including in various pleadings and at

---

[169] *See Amchem*, 521 U.S. at 613-14; *Monk III*, 30 Vet.App. at 174. Manageability is generally not a concern in Rule 23(b)(2) class actions. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). Even in actions brought under Rule 23(b)(3) where manageability is a mandatory consideration, potential difficulty managing a class action "will rarely, if ever, be in itself sufficient to prevent certification of a class." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1272 (11th Cir. 2004). In any event, we see no reason to deny class certification in this case on manageability grounds—this case is highly manageable, particularly when compared to the massive multistate litigations routinely certified as class actions by district courts. *See, e.g., In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (certifying a nationwide class with between 232.8 and 250 million potential members).

[170] FED. R. CIV. P. 23(g)(1).

[171] FED. R. CIV. P. 23(g)(2).

[172] Advisory Committee's Notes to FED. R. CIV. P. 23.

[173] FED. R. CIV. P. 23(g)(1)(A)-(B).

oral argument. Via exhibits attached to the amended petition,[174] counsel have shown that they have done extensive work developing the arguments in this case; demonstrated class action and substantive legal experience; demonstrated relevant legal knowledge of veterans, class action, and statutory interpretation law; and demonstrated willingness to litigate the claim.[175] Therefore, and because there are no "other matter[s] pertinent to counsel's ability to fairly and adequately represent the interests of the class," counsel is "adequate" under the terms of Rule 23(g). We will appoint Mark B. Blocker, Esq., of Sidley Austin LLP, and Barton F. Stichman, Esq., of the National Veterans Legal Services Program, as class counsel in this matter.

*vii. Superiority*

Although Rule 23(b)(2) does not require that the party seeking class certification demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" like Rule 23(b)(3) does, we nevertheless address that issue, as this Court did in *Godsey*.[176] The Court hasn't yet created a test or standard for evaluating superiority.[177] But, among other considerations, this case's unique circumstances demand the enforcement advantages that a class action offers over another precedential decision.

Compare enforcement in a precedential-decision versus class-action context.[178] A precedential decision certainly binds VA in future claims.[179] But if for whatever reason VA errs with respect to other claims, those aggrieved claimants don't have any right to prompt remedial enforcement. Full exhaustion of the agency review process, followed by an appeal to this Court, is their only recourse. But sometimes circumstances indicate a need for prompt remedial enforcement. There, class certification provides such enforcement. The resulting relief, if awarded, could be enforced by *any* class member, particularly those who are absent, who suffers, for example, error based on VA noncompliance.[180]

Here, though *another* precedential decision would undoubtedly bind VA, Petitioner Wolfe's allegations uniquely highlight the inferiority of a precedential decision under the facts before us. VA could circumvent another decision—as it allegedly did *Staab*—without concern about enforcement beyond another appellate proceeding. If we award the Wolfe Class's requested relief, any class member (particularly those who are absent) who suffers VA's noncompliance could enforce it. This case's allegations about VA's post-*Staab* conduct demand a means for prompt collective enforcement.

---

[174] *See* Am. Pet. Exs. A-O.

[175] *See* FED. R. CIV. P. 23(g)(1)(A)(i)-(iv).

[176] 31 Vet.App. at 224.

[177] *See id.* (finding the class action device superior in the case at hand but not offering a test).

[178] *See id.* (discussing enforcement).

[179] *See* 38 U.S.C. § 502.

[180] *See* 38 U.S.C. § 7265(a)(3) (empowering us to "punish by fine or imprisonment" any "disobedience or resistance to its lawful writ, process, order, rule, decree, or command").

Further, the class action device here would allow for consistent adjudication of similar claims involving this regulation and allow the Court to more quickly address this systemic issue to reduce delay associated with individual appeals. The Court can compel correction of the alleged, systemic disregard for both *Staab* and section 1725 and ensure that veterans are treated alike.[181] To force class members to proceed through the normal appellate process individually would amount to a monumental waste of agency and judicial resources in a system already rife with delay.[182] In short, a class action is a more efficient and effective vehicle for resolving this case than a precedential decision focused on an individual veteran's case.[183]

### *viii. Opt-Out and Notice*

We have two final, related matters to consider. We must first determine whether to afford class members the opportunity to opt out of the class we have certified. Next we must determine what type of notice, if any, to provide to the class about this certification decision. The issues are related because, if opt out rights are available, ensuring actual notice of the pendency of the class action takes on greater importance.

Because this is a class certified under Rule 23(b)(2)[184] and relief of invalidating the Regulation and issuing corrective notice is indivisible,[185] combined with the Court's national jurisdiction,[186] we won't allow class members the opportunity to opt out. Because class members don't have the right to opt out of the certified class, notice is less critical than if class members could remove themselves from the class.

This case is comparable to *Godsey* in that we need not provide notice of certification to the affected class members because, like in *Godsey*, we're resolving the class certification request and the merits of the underlying petition concurrently.[187] Also, and as we will discuss below, as part of the relief for those affected veterans we grant, the Secretary will issue notice correcting his misinterpretation of section 1725; that notice renders separate notice of certification largely unnecessary as a practical matter.[188]

### *ix. Certification of the Class*

---

[181] *See Monk II*, 855 F.3d at 1321.

[182] *See Martin*, 891 F.3d at 1349-53 (Moore, J., concurring).

[183] *See Godsey*, 31 Vet.App. at 224.

[184] *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990).

[185] *See In re Allstate Ins. Co.*, 400 F.3d 505, 506 (7th Cir. 2005) (commenting that "[t]he thinking behind this distinction [concerning opt-out rights] is that declaratory and injunctive relief will usually have the same effect on all members of the class as individual suits would").

[186] *See* 38 U.S.C. § 7269.

[187] *See Godsey*, 31 Vet.App. at 224-25.

[188] This conclusion, however, is based on the unique circumstances of this case and should not be construed as a holding that class certification notice is not necessary in future cases. *See id.*

For the reasons outlined above, the Court certifies the following class for purposes of this petition:

> All claimants whose claims for reimbursement of emergency medical expenses incurred at non-VA facilities VA has already denied or will deny, in whole or in part, on the ground that the expenses are part of the deductible or coinsurance payments for which the veteran was responsible.

Having decided the request for class certification, the Court now proceeds to the merits of the class members' petition.

## B. Merits of the Class Petition

Having determined that we have jurisdiction—or power—to proceed, and that we will certify the Wolfe Class, we turn to whether we should issue the writ requested.[189] This Court has authority to issue extraordinary writs in aid of its jurisdiction pursuant to the AWA.[190] However, "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."[191] Three conditions must be met before the Court can issue a writ: (1) The petitioner must demonstrate the lack of adequate alternative means to obtain the desired relief, thus ensuring that the writ is not used as a substitute for an appeal; (2) the petitioner must demonstrate a clear and indisputable right to the writ; and (3) the Court must be convinced, given the circumstances, that issuance of the writ is warranted.[192] Because Petitioner Wolfe meets all three of these conditions, we can and will issue a writ here.

### i. Clear and Indisputable Right to the Writ

In the context of the petition before us, the question whether petitioner is clearly and indisputably entitled to a writ comes down to whether 38 C.F.R. § 17.1005(a)(5) is invalid because it is inconsistent with 38 U.S.C. § 1725. As we now explain, it is.

When reviewing "an agency's construction of the statute which it administers," a court always asks first "whether Congress has directly spoken to the precise question at issue," and, "if the intent of Congress is clear, that is the end of the matter [because] the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[193] However, "if the

---

[189] As we noted above, the Secretary conflates the question of jurisdiction with whether the substantive requirements for the issuance of the writ have been met. We stress that these questions are, importantly, distinct. The first, jurisdiction, goes to whether we have *power* to do anything. The second assumes we have the authority to act and focuses on whether the Court should on the facts *exercise* that power.

[190] *See Cox*, 149 F.3d at 1363-64; *Kelley v. Shinseki*, 26 Vet.App. 183, 185 (2013).

[191] *Kerr*, 426 U.S. at 402.

[192] *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004); *Kelley*, 26 Vet.App. at 186-92.

[193] *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984).

statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[194]

Again, here are the relevant provisions. The statute states: "The Secretary may not reimburse a veteran under this section for *any copayment or similar payment* that the veteran owes the third party or for which the veteran is responsible under a health-plan contract."[195] And the regulation states: "VA will not reimburse a veteran under this section for *any copayment, deductible, coinsurance, or similar payment* that the veteran owes the third party or is obligated to pay under a health-plan contract."[196]

Let's assume for the sake of argument that section 1725(c)(4)(D)'s "any copayment or similar payment" language is ambiguous and leaves a gap. In other words, VA rulemaking may properly expand upon "or similar payment." The question is whether VA's inclusion of "deductibles" and "coinsurance" (but not "balance billing"[197]) in the list of non-reimbursable items is a permissible construction of section 1725. No matter what standard of review we use,[198] it's not. We hold § 17.1005(a)(5) is not based on a permissible construction of section 1725(c)(4)(D) for two related, but distinct, reasons: (1) It's inconsistent with *Staab*'s interpretation of section 1725, and (2) deductibles and coinsurance aren't "similar" to a copayment (and VA didn't explain—to defeat arbitrariness—how they're "similar" to a copayment).

Let's start by discussing what a copayment, deductible, coinsurance, and balance billing are. A "copayment" is a commonly used word (not simply legalese), and, when possible, courts "assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'"[199] Consumers of health insurance know that when they visit their doctors or seek urgent or emergency care, they are expected to pay a small, fixed, and consistent amount for their visit, usually between $20 and $50, when they receive their care. VA uses these types of small, fixed-cost copayments for its extended care services.[200] *Black's Law Dictionary* defines the term as: "a fixed amount that a patient pays to a healthcare provider according to the terms of the patient's health care plan."[201] The U.S. Centers for Medicare & Medicaid Services defines copayment as "a fixed amount ($20, for example) you pay for a covered health care service after you've paid your deductible."[202] In *Riemer v. Columbia Medical Plan, Inc.*, the Court of Appeals of Maryland defined a copayment

---

[194] *Id.* at 844.

[195] 38 U.S.C. § 1725(c)(4)(D) (emphasis added).

[196] 38 C.F.R. § 17.1005(a)(5) (emphasis added).

[197] *See* Resp't's Sur-Response to the Court's May 31, 2019, Order at 2-3.

[198] *See Chevron*, 467 U.S. at 843-44.

[199] *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (quoting *Richards v. United States*, 396 U.S. 1, 9 (1962)).

[200] *See* 38 C.F.R. § 17.111(b)(1)(i)-(vii) (2019) (including copayments ranging from $5 to $97).

[201] *Copayment*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[202] *Copayment*, HealthCare.gov, https://www.healthcare.gov/glossary/co-payment (last visited Aug. 7, 2019).

as "a relatively small fixed fee required of a patient by a health insurer . . . at the time of each outpatient service or filling of a prescription."[203] These various definitions are consistent, and they inform our definition here: A copayment is a relatively small fixed fee that an insured party pays when he or she receives care.

Ordinary consumers also know that, for many types of insurance coverage, there is a certain amount of money that they must pay out-of-pocket before their insurance company will begin covering their claim—commonly known as a "deductible." Per *Black's Law Dictionary*, a deductible is "the portion of the loss borne by the insured before the insurer becomes liable for payment."[204] The U.S. Centers for Medicare & Medicaid Services defines a deductible as: "the amount you pay for covered health care services before your insurance plan starts to pay."[205] Deductible amounts are a part of the insurance agreement between the consumer and the insurer and are agreed upon when the parties enter their insurance contract. Although these costs are fixed, they are not typically small. A 2018 survey conducted by the Kaiser Family Foundation noted that "[t]he average deductible among covered workers in a plan with a general annual deductible is $1,573 for single coverage."[206] So, in short, a deductible is a relatively large but fixed cost that an insured party pays before insurance begins to pay.

Next, we turn to coinsurance. *Black's Law Dictionary* does not define coinsurance. However, Webster's Dictionary provides this definition: "health insurance in which the insured is required to pay a fixed percentage of the costs of medical expenses after the deductible has been paid and the insurer pays the remaining expenses."[207] The U.S. Centers for Medicare & Medicaid Services defines coinsurance as "[t]he percentage of costs of a covered health care service you pay (20%, for example) after you've paid your deductible."[208] This health care cost can vary depending on the type and severity of care needed and the terms and conditions of an insurance contract. In sum, then, coinsurance is a relatively large, variable cost that an insured party pays before insurance begins to pay.

Finally, the Secretary asserts that balance billing is an example of a potentially reimbursable cost that is a patient's "remaining liability" beyond a copayment, deductible, or coinsurance.[209] Balance billing is "[a] healthcare provider's practice of requiring a patient or other responsible party to pay any charges remaining after insurance and other payments and allowances

---

[203] 747 A.2d 677, 687 (Md. 2000) (citing THE MERRIAM-WEBSTER DICTIONARY 177 (1994)).

[204] *Deductible*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[205] *Deductible*, HealthCare.gov, https://www.healthcare.gov/glossary/deductible (last visited Aug. 7, 2019).

[206] 2018 Employer Health Benefits Survey, Henry J. Kaiser Family Foundation (Oct. 3, 2018), https://www.kff.org/health-costs/report/2018-employer-health-benefits-survey.

[207] *Coinsurance*, Merriam-Webster, https://www.merriam-webster.com/dictionary/coinsurance (last visited Aug. 7, 2019).

[208] *Coinsurance*, HealthCare.gov, https://www.healthcare.gov/glossary/co-insurance/ (last visited Aug. 7, 2019).

[209] Resp't's Sur-Response to the Court's May 31, 2019, Order at 2-3.

have been applied to the total amount due for the provider's services."[210] But both federal and state law to some extent protects consumers against balance billing,[211] so it's not clear how many veterans would actually bear these costs. And the Secretary doesn't allege anything or provide any data that shows us that his regulation creates a different world than the one that his previous regulation did. Nor does the legislative or regulatory history mention balance billing as a cost for which Congress sought to reimburse veterans. So we won't discuss balance billing further. Now that we have an idea of what we're talking about, we address the reasons why § 17.1005(a)(5) isn't based on a permissible construction of section 1725.

First, no matter how you compare a copayment, deductibles, and coinsurance to determine "similarity," as reflected in the Secretary's data, § 17.1005(a)(5)'s effect is what it is: It eliminates in effect any potentially reimbursable, remaining liability for veterans who have partial coverage from a health-plan contract.[212] As of late, the Secretary even seems to acknowledge and embrace this result; essentially, he posits that Congress gave something (i.e., "removed the partial health insurance bar") that it took away simultaneously (i.e., "erected a bar that covers nearly all of the same ground: the cost-share exclusion").[213] Setting aside our first impression of that position as inherently absurd, such a result directly contravenes how the statute works, which we explained in *Staab*. Though *Staab* interpreted section 1725(b)(3)(B) specifically,[214] it ends up being controlling as to how we must construe section 1725(c)(4)(D) too. A minimum takeaway from *Staab* is that veterans who have partial coverage from a health-plan contract are eligible for reimbursement of "that portion of expenses not covered by a health-plan contract."[215] As part of its holding, the Court concluded that "Congress intended that veterans be reimbursed for the portion of their emergency medical costs that is not covered by a third[-]party insurer and for which they are otherwise personally liable."[216] But because § 17.1005(a)(5) in effect eliminates all possible remaining liability, it's necessarily inconsistent with the statute as described in *Staab*. And we must construe a statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error."[217] If we construed section 1725(c)(4)(D) such that § 17.1005(a)(5) was valid under it, then we'd render insignificant those parts of the statute at issue in *Staab* that allow for reimbursements to veterans with partial coverage.[218] And, simply put,

---

[210] *Balance billing*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[211] *See* Margaret Darling, Caitlin Brandt, Loren Adler, & Mark Hall, "Receive a surprise medical bill? Here are two federal actions that may address surprise bills, BROOKINGS (Aug. 8, 2017), https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2017/08/08/receive-a-surprise-medical-bill-here-are-three-federal-actions-that-may-address-surprise-bills.

[212] *See supra* pp. 11-12.

[213] Resp't's Sur-Response to the Court's May 31, 2019, Order at 1-2.

[214] 28 Vet.App. at 53-54.

[215] *Id.* at 54.

[216] *Id.*

[217] SUTHERLAND § 46:6; *see Splane*, 216 F.3d at 1068-69.

[218] *See, e.g.*, 38 U.S.C. § 1725(b)(3)(B)-(C).

one can only entertain the Secretary's arguments[219] if one ignores *Staab*, which we can't and won't do.[220] For veterans with some insurance coverage, § 17.1005(a)(5) has transformed section 1725(c)(4)(D)'s narrow exclusion into a gaping exception that swallows whole the section-1725 rule. Such a result is "patently absurd."[221] And this we can't allow. We could stop there, but there's a second reason why § 17.1005(a)(5) isn't based on a permissible construction of section 1725.

Even if one ignores *Staab*, deductibles and coinsurance are not "similar" to a copayment. Before we can get into contrasting them, though, we must talk about the appropriate standard of comparison. After all, it's impossible to decide whether two things are similar if you don't know by what to judge them. The plain language of the statute contains guidance on the appropriate standard of comparison: the key statutory phrase "any copayment or similar payment."[222] From that, we know any other excluded payment must be "similar" to a copayment. Specifically, similar in amount and a fixed nature.[223]

The Secretary wants "cost-sharing" as the standard of comparison.[224] But Congress didn't use the umbrella phrase "cost-sharing" to group and exclude copayments, deductibles, *and* coinsurance, even though Congress knows how to group them together this way and has done it

---

[219] Resp't's Resp. to Am. Pet. at 13-24.

[220] *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992) ("Where there is an earlier panel or en banc opinion, we apply a rule that in a subsequent case, a panel or single judge may not render a decision which conflicts materially with such earlier panel or en banc opinion. In this way we assure consistency of our decisions.").

[221] *United States v. Brown*, 333 U.S. 18, 27 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences.").

[222] 38 U.S.C. § 1725(c)(4)(D).

[223] *See, e.g.*, 155 CONG. REC. H4069-01 (daily ed. Mar. 30, 2009) (statement of Rep. Brown-Waite) (explaining that the law was intended to "ensure that veterans are not saddled with *massive* emergency room bills" (emphasis added)). Note also that Congress didn't want to penalize veterans who had some insurance coverage. *See* 155 CONG. REC. H4069-01 (daily ed. Mar. 30, 2009) (statement of Rep. Halvorson) (noting that "veterans do not currently receive any reimbursement from the VA if they have third-party insurance that pays either full or a portion of the emergency care," which "creates an inequity that penalizes veterans with insurance," and explaining that the amendment "eliminates this inequity by requiring the VA to pay for emergency care in a non-VA facility, even if the veteran holds a policy that will pay for any portion of their care").

[224] Resp't's Resp. to Am. Pet. at 17-18. He argues that all three—copayments, deductibles, and coinsurance—are similar because they are all cost-sharing tools, sharing the same basic function or purpose: to discourage clinically unnecessary treatment. *Id.* The Secretary also asserts that other Federal programs view these three cost-sharing tools as similar and provides examples. *Id.* at 18-19. Though he is correct that those are all superficially "similar" in that they are cost-sharing devices, he didn't pick a workable standard of comparison. His standard is redundant of other program criteria that go to establishing the emergent, clinically necessary nature of the care. *See* 38 C.F.R. §17.1002(a)-(h) (2019). For example, condition (b) in 38 C.F.R. § 17.1002 provides that the treatment must be "for a condition of such a nature that a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health." It is evident from VA's overall emergency care regulation itself that any expenses for reimbursement in this context can only be for *clinically necessary treatment*. This is yet another way of ruling out cost-sharing as the standard of comparison.

elsewhere.[225] Congress has also referred to "copayments or cost shares"[226] elsewhere, but again, it didn't use such language here. Congress's chosen language means that our standard of comparison is whether another payment is "similar" to a copayment, not whether another payment is classified as a cost-sharing device. The latter inquiry has no basis in the statute language before us.

Now that we've determined the appropriate standard of comparison, let's compare. A deductible is not "similar" to a copayment because, though it is fixed, it is not a relatively small fee. Nor is coinsurance "similar" to a copayment because coinsurance is neither a relatively small nor a fixed fee; it's a relatively large and variable fee based on a percentage. And upon finalizing its rule that included § 17.1005(a)(5), VA made no effort to explain its bases for considering them "similar" payments. [227] Therefore, § 17.1005(a)(5), which includes both deductibles and coinsurance as "similar payment[s]," is not based on a permissible construction of section 1725.[228] The class's right to the writ is clear and indisputable.

### ii. Lack of Adequate Alternative Means

Having established that petitioner Wolfe has an indisputable right to relief, we turn to whether she has shown that she lacks adequate alternative legal channels through which she may obtain relief in this case. She has under the unique circumstances of this case.

A petitioner shows that she has exhausted and now lacks adequate alternative legal channels if her pursuit of the alternative legal channels would amount to a "useless act."[229] Practical futility in terms of an administrative process can make a formal remedy insufficient and amount to a useless act. "Resort to the administrative process is futile if the agency will almost certainly deny any relief . . . because it . . . lacks jurisdiction over[] the matter."[230] In colloquial terms, we do not put form over substance.

---

[225] *E.g.*, 42 U.S.C. § 300mm-41(c)(1) (discussing "deductibles, copayments, coinsurance, other cost sharing").

[226] *E.g.*, 10 U.S.C. § 1073 note (regarding the Pilot Program on Incorporation of Value-Based Health Care in Purchased Care Component of TRICARE Program, known as Pub. L. No. 114-328, Div. A, Title VII, § 701(h), Dec. 23, 2016, 130 Stat. 2188).

[227] *See* 83 Fed. Reg. 974.

[228] The Secretary argues that petitioner Wolfe's interpretation would render section 1725's "or similar payment" language superfluous. Resp't's Resp. to Am. Pet. at 19-20. Not so. Petitioner Wolfe suggests that it "provide[s] [VA] flexibility in the event of changing terminology." Pet'rs' Reply to Resp't's Resp. to Am. Pet. at 6. Indeed, she even quotes the Secretary, *id.*, who wrote, "Congress's use of the phrase 'or similar payment' also affords VA the regulatory flexibility to align this provision's scope with evolving health insurance practice and terminology." Resp't's Resp. to Am. Pet. at 20.

[229] *Erspamer*, 1 Vet.App. at 11; *see Margolis v. Banner*, 599 F.2d 435, 443 (CCPA 1979).

[230] *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986).

The Secretary asserts only that a direct appeal through the administrative system is an adequate alternative means of seeking petitioner's requested relief (i.e., invalidation of the Regulation etc.).[231] Here, disputing the regulation's validity within the administrative appeals process amounts to "a useless act" and would be futile because the Board doesn't have jurisdiction to invalidate the regulation.[232] Thus, petitioner lacks an adequate alternative legal channel because the Board can't provide the relief she seeks.

### iii. Issuance of the Writ is Warranted Given the Circumstances

"[I]t is important to remember that issuance of the writ is in large part a matter of discretion with the court to which the petition is addressed."[233] This case contains plenty of extraordinary—if not unique—circumstances we have discussed extensively in this order,[234] Most recently relevant, per VA's Office of the Inspector General, we know that VA "will take corrective actions on claims determined to have been improperly denied for the presence of [OHI] after April 8, 2016" (the date *Staab* issued) and "anticipate[] implementation by late 2019."[235] To be clear, this audit didn't address the questions we confront in this case regarding § 17.1005(a)(5)'s validity. The audit unearthed and corrected issues above and beyond those we discuss here. Though the report's corrective actions aren't relevant on the surface, they do impact this case because affected veterans will likely get caught up in "readjudications" that will only perpetuate the errors of law we address in this order. Fortunately, we have the power and opportunity to intervene now to prevent enormous bureaucratic waste that would result from VA's continued erroneous adjudications and communications, so we will. We hold that issuance of the writ is warranted.

## C. Remedy

Having determined that the regulation is invalid, the Court must now determine what relief is appropriate to remedy the classwide harm. The petitioners initially asked the Court to declare 38 C.F.R. § 17.1005(a)(5) invalid because it is contrary to 38 U.S.C. § 1725(c)(4)(D); invalidate the Secretary's decisions made under § 17.1005(a)(5) to the extent they denied reimbursement to Wolfe Class members for medical expenses deemed deductibles or coinsurance; order the Secretary to readjudicate these reimbursement claims under section 1725(c)(4)(D)'s proper interpretation; and order such other relief as may be appropriate in the interest of justice and in aid of the Court's jurisdiction.[236] The Court will order the Secretary to do all of that plus other relief that gets at the "corrective letters."

---

[231] Resp't's Resp. to Am. Pet. at 11-13.

[232] *See* 38 U.S.C. § 7104(c) ("The Board shall be bound in its decisions by the regulations of the Department . . . .")

[233] *Kerr*, 426 U.S. at 403 (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 112 n.8 (1964); *Parr v. United States*, 351 U.S. 513, 520 (1956)).

[234] *Supra* Part II.

[235] Office of Audits & Evaluations, Office of the Inspector Gen., Dep't of Veterans Affairs, Audit Rep. No. 18-00469-150, Veterans Health Admin.: Non-VA Emergency Care Claims Inappropriately Denied and Rejected (Aug. 6, 2019), at 15; *see id.* at 10.

[236] Am. Pet. at 3-4.

We can't allow VA to send out "corrective" notices that contain the following language: "It is important to note that VA has no legal authority to pay a Veteran's cost shares, deductibles, or copayments associated with their other health insurance."[237] Because § 17.1005(a)(5) is invalid, and this statement is clearly derived from § 17.1005(a)(5), it's also an incorrect interpretation of section 1725. Therefore, we'll also order the Secretary to stop issuing the Category A and C letters and to strike the problematic language we've identified in this paragraph. In addition, the Secretary must prepare a plan to correct the incorrect notices that have already been sent.

One final note. As for the readjudications' logistics, the Secretary stated he would process Category A and C claims under the AMA and Category B claims as Legacy appeals.[238] However, he seems to ignore his own regulation, 38 C.F.R. § 3.2400, which delineates the standard for determining under which system—Legacy or AMA—to adjudicate a claim.[239] On remand, the Secretary should look closely at this issue along with the others to ensure compliance with both statute and regulation.

---

[237] Resp't's Resp. to the Court's May 14, 2019, Order, Exs. 1 (Category A template), 3 (Category C template).

[238] Resp't's Supp. Resp. to the Court's May 14, 2019, Order at 1-2.

[239] 38 C.F.R. § 3.2400(a)-(b) (2019).

Upon consideration of the foregoing, it is

ORDERED that the Wolfe Class is certified as defined here: "All claimants whose claims for reimbursement of emergency medical expenses incurred at non-VA facilities VA has already denied or will deny, in whole or in part, on the ground that the expenses are part of the deductible or coinsurance payments for which the veteran was responsible." It is further

ORDERED that Mark B. Blocker, Esq., of Sidley Austin LLP, and Barton F. Stichman, Esq., of the National Veterans Legal Services Program, are appointed as class counsel. It is further

ORDERED that 38 C.F.R. § 17.1005(a)(5) is invalid because it is contrary to 38 U.S.C. § 1725. It is further

ORDERED that the Secretary's decisions made under § 17.1005(a)(5), to the extent they denied reimbursement to Wolfe Class members for medical expenses deemed deductibles or coinsurance, in whole or in part, are invalid. It is further

ORDERED that Secretary must readjudicate these reimbursement claims under section 1725's proper interpretation. It is further

ORDERED the Secretary stop sending its corrective letters immediately because they contain incorrect statements of what the law is, namely: "It is important to note that VA has no legal authority to pay a Veteran's cost shares, deductibles, or copayments associated with their other health insurance." And it is further

ORDERED that within 45 days of the date of the order the Secretary prepare and submit to the Court for approval a plan for providing notice to veterans affected by the provision of notice that contained an incorrect statement of the law concerning reimbursement of costs for non-VA emergency care.

DATED: September 9, 2019                                    PER CURIAM.

FALVEY, *Judge,* dissenting: I respectfully dissent from my colleagues' decision to grant mandamus relief. I would deny Ms. Wolfe's petition because her requested mandamus relief is not in aid of our appellate jurisdiction.[240] Nor does she demonstrate an indisputable right to a writ. And, our statutorily prescribed appeals process provides her with adequate alternative means to obtain her desired relief. Though I will focus my analysis on Ms. Wolfe, I would, for the same reasons, deny mandamus relief for the Wolfe class.

Admittedly, we have authority under the AWA to "issue all writs necessary or appropriate in aid of [our] jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see also Monk v. Shulkin*, 855 F.3d 1312, 1318 (Fed. Cir. 2017) ("The [AWA] unquestionably applies in the Veterans Court."). But "[t]he remedy of mandamus is a drastic one,

---

[240] I agree with the Court's decision to dismiss Mr. Boerschinger's petition as moot.

to be invoked only in extraordinary situations." *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 402 (1976). Mandamus relief is not appropriate unless three conditions are met: (1) The petitioner must demonstrate a clear and indisputable right to the writ; (2) the petitioner must demonstrate the lack of adequate alternative means to obtain the desired relief, thus ensuring that the writ is not used as a substitute for the appeals process; and (3) the Court must be convinced, given the circumstances, that issuance of the writ is warranted. *Cheney v. U.S. Dist. Court,* 542 U.S. 367, 380-81 (2004). Because Ms. Wolfe's petition is not in aid of our jurisdiction and does not meet the requirements for a writ, the Court should not grant mandamus relief.

## 1. Not in Aid of our Jurisdiction

The AWA authorizes us to issue only those writs that are in aid of our appellate jurisdiction. 28 U.S.C. § 1651(a). This is because the AWA is not an independent grant of jurisdictional authority. *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943). The AWA does not expand a court's jurisdiction. *Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998). Rather, it is "a residual source of authority" that allows us to protect our statutorily prescribed jurisdiction. *Pennsylvania Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985). "It permits federal courts to fill gaps in their judicial power where those gaps would thwart the otherwise proper exercise of their jurisdiction." *Monk*, 855 F.3d at 1318. Or it "remove[s] obstacles to an appeal." *Roche*, 319 U.S. at 26. But the AWA does not create jurisdiction where it does not already lie. *In re Tennant*, 359 F.3d 523, 530 (D.C. Cir. 2004) ("[M]andamus would otherwise be an original action, not in aid of appellate jurisdiction.").

The party seeking a writ therefore must show "that the action sought by mandamus is within the court's statutorily defined subject matter jurisdiction." *In re Matter of Wick*, 40 F.3d 367, 372-73 (Fed. Cir. 1994). Our jurisdiction is defined by statute. *Burris v. Wilkie*, 888 F.3d 1352, 1357 (Fed. Cir. 2018). In 38 U.S.C. § 7252, Congress granted us appellate jurisdiction over final Board decisions. That statute states that we have "exclusive jurisdiction to review decisions of the Board" and that our review must be "on the record of proceedings before the Secretary and the Board." It further provides that our review of final Board decisions is "limited by the scope provided in section 7261." Section 7261 lists actions to take and standards to apply during our appellate review. Of relevance here, the statute states that we may "decide all relevant questions of law," "interpret . . . regulatory provisions," and "compel action of the Secretary unlawfully withheld or unreasonably delayed." 38 U.S.C. § 7261(a); *see also Martin v. O'Rourke*, 891 F.3d 1338, 1343 (Fed. Cir. 2018) (section 7261 "provides the standards the . . . Court must use when reviewing actions of the Secretary"). Taken together, section 7252 and 7261 allow us to decide questions of law and compel unlawfully withheld secretarial action, among other things, in the context of reviewing final Board decisions.

We thus may grant a petition for writ of mandamus when the relief sought has some sort of relationship to a final Board decision over which we could exercise jurisdiction. *See Cox*, 149 F.3d at 1364-66 (addressing whether the appellant's fee agreement dispute could lead to a final Board decision such that a writ of mandamus would be appropriate). But Ms. Wolfe's petition lacks such a connection. She does not contend that the Secretary is refusing to process her claim, unreasonably delaying its adjudication, or performing any other action that would prevent her

dispute from making its way to our Court.[241] She doesn't want us to remove an obstacle. Instead, she wants to skip the appeals process entirely and bring her regulatory challenge directly to the Court.

She asks the Court to directly determine the validity of § 17.1005(a)(5) and find, in the first instance, that VA incorrectly denied reimbursement under that regulation. Granting her requested relief would thwart, not aid, our appellate jurisdiction. Because granting Ms. Wolfe's petition could not lead to a final Board decision reviewable by this Court, and would, in fact, abrogate the need for such a decision, her requests for relief are not in aid of our jurisdiction, and her petition must be denied. *Am. Legion v. Nicholson*, 21 Vet.App. 1, 7 (2007); *Yi v. Principi*, 15 Vet.App. 265, 267 (2001) ("[T]he Court's jurisdiction to issue the order sought by the petitioner depends upon whether the Court would have jurisdiction to review the final Board decision that would issue pursuant to that order.").

The majority concludes that Ms. Wolfe's requests for relief are in aid of our jurisdiction for two reasons. First, because "the regulation itself risks frustrating the exercise of our statutorily granted jurisdiction over Board decisions." *See ante* at 16. And second, because the letters notifying claimants they wouldn't be reimbursed for "cost-sharing" devices under the regulation could discourage claimants from appealing. *Id.* But, this is true of everyone who has a disagreement with any regulation promulgated by the Secretary. Put another way, the majority says that we should issue an extraordinary writ whenever a claimant disagrees with a VA regulation and gets a letter telling the claimant he or she was denied based on that regulation.

I simply do not agree. Merely citing a regulation that the petitioner believes is invalid is not enough to warrant a writ of mandamus. Many decisions in the VA system turn on the applicability or interpretation of a VA regulation, and "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Kerr,* 426 U.S. at 402. Moreover, informing claimants that their claims have been denied under § 17.1005(a)(5) is not the functional equivalent of a refusal to act. The Secretary is required by law to inform a claimant of the bases on which VA has denied her claim. 38 U.S.C. § 5104(b). Rather than creating a chilling effect, providing a claimant the reason for a VA denial helps the claimant appeal a wrongful decision.

Nor do I agree with the majority that we have the authority to grant Ms. Wolfe's request for direct regulatory review without the prospect of a final Board decision merely because we have prospective jurisdiction over her claim. Our AWA authority to act in cases within our prospective jurisdiction is not that unfettered. It is tied to the exercise of our actual appellate jurisdiction: we have authority under the AWA to act in cases potentially within our jurisdiction when our action is "in aid of the appellate jurisdiction which might otherwise be defeated." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 603 (1966); *see also McClellan v. Carland*, 217 U.S. 268, 280 (1910) ("We

---

[241] The majority notes that a November 20, 2018, letter from the Secretary states that Ms. Wolfe's appeal was "closed." *Ante* at 10. If this letter showed the Secretary's refusal to process Ms. Wolfe's appeal, thus foreclosing the possibility of a final Board decision addressing the denial of reimbursement, the AWA would give us the authority to remove this obstacle to our appellate jurisdiction. *See Roche*, 319 U.S. at 26. But in her amended petition Ms. Wolfe does not ask us to take this action. Rather, she maintains that her appeal to the Board is being processed and that she is "continu[ing] to pursue her direct appeal." Am. Pet. at 10 n.2.

think it the true rule that where a case is within the appellate jurisdiction of the higher court a writ may issue in aid of the appellate jurisdiction which might otherwise be defeated."). Otherwise, "[t]he mandamus would . . . be an original claim, not in aid of appellate jurisdiction." *In re Tennant*, 359 F.3d at 530.

Ms. Wolfe's status as a prospective appellant allows us to use our mandamus power only if her requested relief were related to bringing her case within our appellate jurisdiction. But Ms. Wolfe's petition does not request such relief. Instead, she asks us to rule in the first instance that § 17.1005(a)(5) is invalid and that the Secretary wrongfully denied reimbursement under that regulation. In essence, she requests we exercise original jurisdiction over regional office denials of reimbursement under § 17.1005(a)(5), rather than act in aid of our appellate jurisdiction over final Board decisions. The AWA does not authorize us to act in these circumstances. Mandamus in support of prospective jurisdiction, "like any exercise of appellate jurisdiction, [i]s limited to review of 'proceedings in a cause already instituted.'" *In re Tennant*, 359 F.3d at 530 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175-76 (1803)).

Also, I do not find that the cases cited by the majority support granting a petition that would effectively deprive the Court of our appellate jurisdiction over a final Board decision. Each of the cases cited by the majority are tied to our actual or prospective appellate jurisdiction, particularly those addressing unreasonable agency delay. As we explained in *Erspramer v. Derwinski*, we may exercise our mandamus authority to address "inadvertent or intentional administrative delay" *because* such delay "directly and adversely effects the potential and prospective appellate jurisdiction of this court." 1 Vet.App. 3, 9 (1990). No case supports the majority's assertion that we may exercise our mandamus power in a case where a petitioner's case is not within our actual jurisdiction *and granting the petition would remove the case from our prospective jurisdiction*. Rather, the AWA "extends to the potential jurisdiction of the appellate court where an appeal is not then pending *but may be later perfected.*" *See F.T.C.*, 384 U.S. at 603 (emphasis added).

I do not read either *Monk* or *Martin* as providing us with the authority to act in the absence of an actual or prospective Board decision. *Monk* dealt with the parties' complaint that they were not able to obtain a Board decision because of VA's continual delays. *Martin* explained that "[b]ecause the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction." *Martin*, 891 F.3d at 1342-43 (citing *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984)). Neither case addressed whether the Court could issue a petition in a case like this one, where Ms. Wolfe does not intend to seek a Board decision before requesting that the Court review the merits of VA's denial of her claim. Furthermore, though the majority states that *Monk* and *Martin* "seemed to assume" that section 7261 provides the Court with authority to address the Secretary's actions in the absence of an actual or potential Board decision, *ante* at 17, neither case so held. Nor could they have done so, as the Federal Circuit is bound by statute, and section 7261 does not provide an independent grant of jurisdictional authority but, rather, defines the scope of our section 7252 jurisdiction to review final Board decisions.

## 2. No Clear and Undisputable Right to a Writ

Ms. Wolfe contends that she is entitled to a writ because 38 C.F.R. § 17.1005(a)(5) conflicts with the plain language of 38 U.S.C. § 1725(c)(4)(d) and runs afoul of *Staab*. But the regulation at issue in this case is not the one invalidated in *Staab*. The Secretary amended § 17.1005(a)(5) in response to *Staab* and he contends that the amended regulation is both a valid interpretation of § 1725(c)(4)(d) and consistent with his authority to "delineate the circumstances under which such payments may be made." 38 U.S.C. § 1725(c)(1)(B).

The Secretary makes a good argument that the amended § 17.1005(a)(5) is a permissible construction of section 1725. The regulation states that that "VA will not reimburse a veteran under this section for any copayment, deductible, coinsurance, or similar payment that the veteran owes the third party or is obligated to pay under a health-plan contract." This language mirrors the language of section 1725(c)(4)(D), except for the addition of "deductible, coinsurance." The Secretary argues that the addition of these terms is consistent with the statute because "deductibles and coinsurance are also cost-sharing tools used in the health insurance industry and, as such, share the same basic function or purpose as copayments." Secretary's Response to Am. Pet. at 17. He argues that the term "cost sharing" is an umbrella term that captures deductibles, coinsurance, copayments, and all other similar charges. And he points out that Ms. Wolfe's interpretation would read out the term "similar payment" from the statute because "if deductibles and coinsurance are not 'similar payment[s]" to copayments . . . , VA is not aware of any other form of payment that would be." *Id*. at 19.

It may be that Ms. Wolfe is correct and the new regulation is invalid for the same reasons invalidating the regulation in *Staab*. But she is not clearly and indisputably correct. The new regulation and the Secretary's justification for it have not yet been the subject of a decision by our Court. At the very least, the Secretary's reasoned and persuasive statutory-interpretation argument shows that the invalidity of § 17.1005(a)(5) is not a foregone conclusion. Because there is no clear and undisputable right to a writ of mandamus, I would deny her petition.

## 3. Adequate Alternative Means To Obtain the Requested Relief

We also should deny Ms. Wolfe's petition because the statutory appeals process provides her with adequate means to obtain her desired relief. "Ordinarily mandamus may not be resorted to as a mode of review where a statutory method of appeal has been prescribed or to review an appealable decision of record." *Roche*, 319 U.S. at 27-28. Rather, a successful petitioner "must demonstrate the lack of adequate alternative means to obtain the desired relief, thus ensuring that the writ is not used as a substitute for the appeals process." *Cheney,* 542 U.S. at 380-81 (2004).

Although Ms. Wolfe asks the Court to review the validity of § 17.1005(a)(5) and reverse VA decisions that have denied benefits under that regulation, she concedes that she is currently in the process of obtaining a Board decision that addresses these issues. The regional office has denied her claim for reimbursement, she has filed a Notice of Disagreement with that decision, and she is awaiting a Statement of the Case that will allow her to perfect her appeal to the Board. Am. Pet. at 10 n.2 (stating Ms. Wolfe's belief that her appeal remains open and pending and that she "will continue to pursue her direct appeal" to the Board).

Ms. Wolfe seeks to use mandamus as a substitute for this appellate process. She would like us to issue a writ in lieu of her completing the statutorily prescribed procedure of appealing a Board decision because it takes too long and, in any event, the Board is obliged to apply VA regulations. But "'extraordinary writs cannot be used as substitutes for appeals, even though hardship may result from delay and perhaps unnecessary trial.'" *Lamb v. Principi*, 284 F.3d 1378, 1384 (Fed. Cir. 2002) (quoting *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379 (1953)). The AWA does not authorize us to "issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pennsylvania Bureau of Corr.*, 474 U.S. at 43. Although "hardship is imposed on parties who are compelled to await the correction of an alleged error at an interlocutory stage by an appeal from a final judgment, . . . such hardship does not necessarily justify resort to certiorari." *U.S. Alkali Exp. Ass'n v. United States*, 325 U.S. 196, 202 (1945).

This is particularly true here, where Congress has explicitly conditioned our jurisdiction on a final decision of the Board. As the Supreme Court explained in *Roche*, when Congress has determined that a court of appeals has jurisdiction over final decisions, it is not appropriate to issue a writ of mandamus to circumvent that jurisdictional requirement. 319 U.S. at 29. "Where the appeal statutes establish the conditions of appellate review an appellate court cannot rightly exercise its discretion to issue a writ whose only effect would be to avoid those conditions." *Id*. at 30. Even when obtaining a final decision from the adjudicator below would be costly and inconvenient, this "inconvenience is one which we must take it Congress contemplated in providing that only final judgments should be reviewable." *Id.*

Finally, I note that a Board decision addressing veterans' claims could find facts in the first instance and develop a record that the Court could base its review on. *See* 38 U.S.C. § 7252(b) ("Review in the Court shall be on the record of proceedings before the Secretary and the Board."); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) ("[A]ppellate tribunals are not appropriate fora for initial fact finding.").

The drastic remedy of mandamus is properly exercised when certain, well established criteria are met. Because Ms. Wolfe's petition is not in aid of our jurisdiction, she lacks an undisputable right to a writ, and there are adequate alternative means to obtain her desired relief, she does not meet the criteria for issuance of a writ of mandamus. And because she is not entitled to a writ, neither is the class. I therefore would deny her petition and that of the Wolfe class.